JOHN G. MARTINEZ, M.D., Appellant, *v.* MARY DOLORES MARUSZCZAK and LISA M. KROL, Surviving Heirs of ROBERT MARUSZCZAK, Deceased; and EMILY WATSON, as Special Administratrix of the Estate of ROBERT MARUSZCZAK, Deceased, Respondents.

No. 44347

October 11, 2007          168 P.3d 720

*John H. Cotton & Associates, Ltd.*, and *John H. Cotton* and *Mara E. Fortin*, Las Vegas, for Appellant.

*Neil G. Galatz & Associates* and *Neil G. Galatz*, Las Vegas, for Respondents.

*Lewis & Roca, LLP*, and *Daniel F. Polsenberg*, Las Vegas; *Bradley, Drendel & Jeanney* and *Thomas E. Drendel*, Reno, for Amicus Curiae Nevada Trial Lawyers Association.

Before the Court EN BANC.

## OPINION

By the Court, MAUPIN, C. J.:

In this appeal, we consider the extent to which sovereign immunity protects publicly employed physicians from common-law liability for medical malpractice. Our analysis necessarily turns on Nevada's statutory waiver of sovereign immunity and a statutory exception to that waiver, which immunizes state actors from liability for actions grounded upon the state actor's exercise or performance of a discretionary function or duty. Because Nevada jurisprudence concerning the scope of the discretionary-function exception is unclear, and because Nevada's statutory language mirrors the Federal Tort Claims Act, we adopt the two-part federal test, as articulated in *Berkovitz v. United States*[1] and *United States v. Gaubert*[2] for determining when the discretionary-function ex-

---

[1]486 U.S. 531, 536-37 (1988).

[2]499 U.S. 315, 322 (1991).

ception to the general waiver of governmental immunity applies. Under this two-part test, state-employed physicians enjoy immunity from medical malpractice liability only when their allegedly negligent acts involve elements of judgment or choice, and the judgment or choice made is of the kind that the discretionary-function exception was designed to shield, that is, a judgment or choice involving social, economic, or political policy considerations. If those two requisites for discretionary-function immunity are not satisfied, state-employed medical professionals are liable for malpractice to the extent of the statutory cap that applies to damages awards in tort actions against state employees.

## FACTS AND PROCEDURAL HISTORY

Robert Maruszczak died of accidental injuries at University Medical Center (UMC) in Las Vegas while under the care of appellant, John Martinez, M.D. Mr. Maruszczak's heirs, Mary Maruszczak and Lisa M. Krol, along with the special administratrix of his estate (collectively referred to as ''the estate''), filed wrongful death claims for medical malpractice against Dr. Martinez. At trial, by stipulation, the district court converted the matter to an action for declaratory relief. It then resolved questions of whether and the extent to which Dr. Martinez, a contract employee of the University of Nevada, School of Medicine (UNSOM), was immunized from liability under NRS Chapter 41, which sets forth the conditions under which the State of Nevada waives sovereign immunity for itself, its political subdivisions and agencies, certain contractors, and public employees.

### Dr. Martinez's employment terms with the University of Nevada, School of Medicine

In order to provide context for the parties' appellate arguments, we first briefly discuss the terms of Dr. Martinez's employment with UNSOM. Dr. Martinez left private medical practice in 1997 to become employed as a full-time, ''tenure-track'' faculty member of UNSOM. As a condition of his employment, he agreed to join UNSOM's nonprofit medical practice plan entity, University of Nevada, School of Medicine Multispecialty Group Practice, Inc. This entity is also known as ''MedAssociates.''

Like many medical practices, MedAssociates coordinates and performs administrative services for its member physicians. These include billing, collections, accounting, and credentialing of member physicians; providing clinical practice facilities, equipment, malpractice insurance, and support staff; and securing paying patient referrals through health insurance plans. Patients and medical service insurers remit payments for services to MedAssociates, a portion of which it distributes to UNSOM for physician salaries.

The remaining revenues defray MedAssociates' general operating overhead and nonmedical employee salaries.

UNSOM employed Dr. Martinez under a written contract signed by his department chairman, the dean of UNSOM, and the chairman of MedAssociates' board of directors. According to the terms of his agreement with MedAssociates, Dr. Martinez could not provide private patient care outside the scope of his services with MedAssociates without the written approval of his direct supervisor, the UNSOM department chairman. Although UNSOM determined Dr. Martinez's compensation and issued his paychecks, his salary upon annual contract renewal was dependent in part upon his annual revenue production through MedAssociates. This arrangement notwithstanding, Dr. Martinez received a regular paycheck even if MedAssociates did not collect enough revenue to cover the agreed base salary. Finally, by virtue of his association with UNSOM, Dr. Martinez received retirement and other benefits through the State of Nevada.

In summary, although MedAssociates manages the employment of its support staff, UNSOM manages the employment of MedAssociates' member physicians and nurse practitioners.

### District court proceedings

The district court ultimately issued a judgment declaring that Dr. Martinez was not entitled to the benefits of sovereign immunity. In particular, the court concluded (1) that Dr. Martinez's treatment of Mr. Maruszczak was a nongovernmental function performed on behalf of MedAssociates, a revenue-generating entity separate from UNSOM; and (2) that, regardless, "proprietary" activities of government, such as the practice of medicine, do not enjoy sovereign immunity protections, qualified or otherwise, as a matter of law. Dr. Martinez appeals.[3]

## DISCUSSION

In NRS Chapter 41, the Nevada Legislature has, with some exceptions, waived Nevada's sovereign immunity from liability.[4] Under this waiver, the State's liability for damages in tort actions is limited to $50,000 per claim.[5] One exception to the general waiver of immunity is set forth in NRS 41.032(2), which provides that the State and its employees are immune from liability for ac-

---

[3]The Nevada Trial Lawyers Association has filed a brief as amicus curiae on the basic sovereign immunity issue and the constitutionality of "capped" liability for publicly employed physicians who compete with the private sector for paying patients.

[4]NRS 41.031.

[5]NRS 41.035; *see also County of Clark v. Upchurch*, 114 Nev. 749, 759-60, 961 P.2d 754, 761 (1998).

tions stemming from the exercise of discretionary functions or the performance of discretionary duties.

Dr. Martinez claims that, as a public employee performing discretionary functions in treating Mr. Maruszczak, within the scope of his public duties, he is completely immune from the estate's suit.[6] Absent immunity, Dr. Martinez claims that his liability for damages related to Mr. Maruszczak's death is "capped" under NRS 41.035(1) at $50,000.

In response, the estate asserts that the practice of medicine is not a governmental function protected by notions of sovereign immunity and that, in any event, Dr. Martinez was not a state employee because of his affiliation with MedAssociates. From this, the estate reasons that the district court properly declared that Dr. Martinez was not entitled to sovereign immunity protection or the statutory damages cap. The estate argues, in the alternative, that capped damages for negligently performed public endeavors that compete with the private sector violates constitutional notions of due process and equal protection.

We agree with the estate that Dr. Martinez is not entitled to discretionary-act immunity under NRS 41.032(2), but we conclude that he is a state employee protected by NRS 41.035(1)'s $50,000 damage limitation. Accordingly, we begin with a discussion of the sovereign immunity doctrine's application to the practice of medicine, and Dr. Martinez's status as a state employee for the purposes of NRS 41.032(2) and NRS 41.035(1). Next, we discuss discretionary-act immunity under NRS 41.032(2) and clarify that actions against medical providers for allegedly negligent medical diagnosis or treatment decisions are not barred under NRS 41.032(2)'s discretionary-function exception to the state's general waiver of immunity, unless those decisions were grounded on public policy considerations. Finally, we discuss NRS 41.035(1)'s damages cap and address the estate's argument that this limitation on damages is unconstitutional.

*Standards of review and statutory construction*

The application of sovereign immunity under NRS Chapter 41 presents mixed questions of law and fact. This court reviews conclusions of law, such as those entailing statutory construction, de novo.[7] This court will not disturb a lower court's findings of fact

---

[6]Given its ruling that Dr. Martinez was involved in a nongovernmental function in connection with his treatment of Mr. Maruszczak, the district court did not reach the question of whether Dr. Martinez, as a state employee, was immune from liability under NRS 41.032(2) in performing discretionary acts in the course of that treatment, discussed *infra*.

[7]*Gilman v. State, Bd. of Vet. Med. Exam'rs*, 120 Nev. 263, 271, 89 P.3d 1000, 1005-06 (2004).

if supported by substantial evidence.[8] Because the primary legislative intent behind the qualified waiver of sovereign immunity from tort liability under NRS Chapter 41 was to waive immunity, we "strictly construe limitations upon that waiver."[9]

*The practice of medicine as a governmental function*

In response to Dr. Martinez's claims of immunity under NRS Chapter 41, the estate first argues that medical treatment is governed by distinct obligations discrete to the doctor-patient relationship and that governmental immunity does not apply. In this, the estate seeks our embrace of a line of cases represented by *Keenan v. Plouffe*, in which the Georgia Supreme Court determined that a state-employed physician was not entitled to official immunity because he was not acting in the course of his "official duties" in his treatment of a patient.[10] The court concluded that the physician's obligations to his patient were independent of his official state duties[11] and that the physician was subject to the common-law duty to treat his patient with reasonable care and skill.[12] For similar reasons, the Virginia Supreme Court, in *James v. Jane*,[13] determined that physician faculty members of a state university medical school were not immune from negligence actions brought by university hospital patients. More specifically, the Virginia court concluded that a university physician's patient "has a right to expect . . . the same care and attention from the physician that he would receive if he were in a private hospital and the physician in private practice."[14]

We conclude that these cases do not comport with the public policy behind our statutory qualified immunity and are not persuasive for six reasons. First, NRS Chapter 41 applies to all state employees, and concluding that employees of our state-funded universities are not entitled to immunity from tort liability would be contrary to the statutory scheme's purpose. Second, the need to ensure that publicly employed persons adhere to minimum standards of care is not limited to the medical profession. Third, stripping state-employed physicians of their qualified immunity will not somehow ensure that they will exercise appropriate care in the treatment of their patients. In the modern context, incidents of mal-

---

[8]*Mainor v. Nault*, 120 Nev. 750, 758-59, 101 P.3d 308, 314 (2004).

[9]*State v. Silva*, 86 Nev. 911, 914, 478 P.2d 591, 593 (1970).

[10]482 S.E.2d 253, 255 (Ga. 1997).

[11]*Id.*; *see also Kiersch v. Ogena*, 595 N.E.2d 696, 701 (Ill. App. Ct. 1992).

[12]*Keenan*, 482 S.E.2d at 257.

[13]282 S.E.2d 864, 870 (Va. 1980).

[14]*Id.* at 867.

practice will affect employability and insurance premium costs and subject physicians to national data bank reporting. Fourth, there has been no showing that publicly employed physicians are, as a group, substandard professional operatives. Fifth, the fact that state-employed physicians may treat private paying patients does not undermine the need for public hospitals to generate income to offset the costs of providing large-scale indigent medical care. Sixth, our adoption of the *Keenan* approach would mark a return to a standard for governmental immunity—the governmental-proprietary distinction—that we long ago rejected.

The estate and amicus argue that there should be no sovereign immunity for "proprietary" functions; *i.e.*, those functions performed by government that are not essential to the core of government activity—functions that private entities or individuals can perform.[15] As a corollary to this argument, they contend that qualified immunity only applies to functions that were protected by sovereign immunity at common law. They note that nongovernmental proprietary functions, such as the practice of medicine, did not enjoy immunity prior to the Legislature's qualified waiver of immunity for tort liability in 1965.[16] As a consequence, the estate and amicus assert that when a governmental entity provides fee-for-service medical services, it operates in a proprietary capacity that has never enjoyed common-law immunity.

Preliminarily, we note that the operation of a public hospital is a core government function designed to ensure broad availability of medical care. Thus, even if the estate and amicus were correct that a distinction should be drawn between "core" governmental functions and nongovernmental "proprietary" functions, their argument would fail. And, while our earlier cases support their argument, our 1970 decision in *Harrigan v. City of Reno* specifically renounced the governmental-versus-proprietary-function framework for analyzing the scope of sovereign immunity under NRS Chapter 41.[17] As we stated in *Harrigan*:

> We eliminate first the concept that the government is amenable to lawsuits when it is engaged in a proprietary capacity. . . . The result we reach . . . is based upon the involvement of tort liability and waiver of immunity by a sovereign [as reflected in NRS 41.031(1)]. The governmental-proprietary test no longer applies.[18]

---

[15]*See, e.g.*, *Yanero v. Davis*, 65 S.W.3d 510, 520 (Ky. 2001); *Condemarin v. University Hosp.*, 775 P.2d 348, 350 (Utah 1989).

[16]*See Granite Oil v. Douglas County*, 67 Nev. 388, 219 P.2d 191 (1950).

[17]86 Nev. 678, 680, 475 P.2d 94, 95 (1970).

[18]*Id.* at 679-80, 475 P.2d at 95 (citations omitted).

In short, the governmental-proprietary distinction retains no vitality in our current analytics concerning sovereign immunity. It is also inconsistent with the basic notion that Nevada's qualified waiver of sovereign immunity is to be broadly construed.[19]

Since we reject the estate's argument that government doctors fall outside the scope of NRS Chapter 41's provisions, we turn to the application of NRS Chapter 41 in this matter. Our strict construction of limits on the state's waiver of sovereign immunity means that questions concerning the scope of NRS Chapter 41's immunity protections are determined based on two issues: (1) whether the actor in question was a state employee or agent, and, if so, (2) whether the employee's acts fall within a statutory exception to the general waiver of sovereign immunity.[20]

*Dr. Martinez's status as a state employee*

The estate contends that Dr. Martinez enjoys no immunity as a state employee because he acted on behalf of MedAssociates, rather than UNSOM, in treating Mr. Maruszczak. Because Dr. Martinez was a paid employee of a state agency, UNSOM, we disagree with the estate's assertion. In *Gallegos by Gallegos v. Southern Nevada Memorial*, the Nevada federal district court determined that doctors employed by a county hospital enjoyed the benefits of limited or "capped" liability under NRS 41.035(1) if they were acting within the scope of their county employment during an alleged act of medical malpractice.[21] In that case, the federal court concluded that the liability cap extended to any hospital employee who participated in the plaintiffs' treatment.[22] While *Gallegos* specifically indicated that nonemployee physicians with staff privileges were unprotected,[23] in this case, UNSOM employed Dr. Martinez under an explicit contract of hire.

We conclude that *Gallegos* was correctly decided and extends by analogy to the instant matter. Like the doctors eligible for partial immunity in *Gallegos*, Dr. Martinez is a state employee. His participation in UNSOM's clinical administrative component, MedAssociates, was a condition of his state employment; he could not provide medical services outside of his scope of services with

---

[19]*See State v. Silva*, 86 Nev. 911, 914, 478 P.2d 591, 593 (1970) ("The apparent legislative thrust was to waive immunity and, correlatively, to strictly construe limits upon that waiver.").

[20]*See* NRS 41.032-.03365.

[21]575 F. Supp. 824, 826 (D. Nev. 1983).

[22]*Id.*

[23]*Id.* at 827.

MedAssociates without written approval from his department chairman at UNSOM; and, while MedAssociates managed the employment of its support staff, UNSOM managed the employment of MedAssociates' member physicians and nurse practitioners.[24] Indeed, UNSOM was responsible for compensating Dr. Martinez and for conferring other employment benefits. We therefore conclude that Dr. Martinez was a state employee for purposes of NRS Chapter 41 when he treated Mr. Maruszczak. Accordingly, we reverse the district court's determination, as a matter of law, that Dr. Martinez was not a state employee entitled to the protections of sovereign immunity.

We now turn to whether Dr. Martinez's acts fall within the discretionary-function exception to the state's waiver of sovereign immunity.

*Discretionary nature of Dr. Martinez's acts*

Dr. Martinez asserts that the practice of medicine, particularly diagnostic decisions and the selection of treatment modalities, inherently involves discretionary functions that are subject to immunity under NRS 41.032(2). While we agree that diagnostic and treatment decisions are discretionary decisions, in that they involve judgment and choice, we disagree with Dr. Martinez's assertion that these types of discretionary decisions are entitled to immunity under NRS 41.032(2).

NRS 41.032(2) provides complete immunity from claims based on a state employee's exercise or performance of a discretionary function or duty:

> [N]o action may be brought under NRS 41.031 . . . which is:
> . . . .
> 2. Based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of the State or any of its agencies or political subdivisions or of any officer, employee or immune contractor of any of these, whether or not the discretion involved is abused.

In concluding that NRS 41.032(2)'s discretionary-function exception to the state's general waiver of sovereign immunity does not extend to the diagnosis and treatment decisions Dr. Martinez made

---

[24]As indicated above, MedAssociates performs solely administrative functions, such as billing, collections, accounting, and communication with patient health insurance providers and managed care providers. While the scope of this opinion is confined to the liability of Dr. Martinez, we note that the estate does not appear to allege that MedAssociates was negligent in performance of these functions or that the actions of MedAssociates as an administrative entity otherwise contributed to Mr. Maruszczak's death.

here, we first briefly review our decisional law interpreting NRS 41.032's scope.

In applying the discretionary-function exception in various contexts, this court has created two separate tests that cannot be reconciled. Initially, we adopted a planning-versus-operational test to determine whether discretionary-function immunity applied, based upon the stage of the government decision-making process at which the challenged decisions were made.[25] Under this test, immunity was available to protect policy decisions, made at the planning level of a project or government endeavor; those decisions were viewed as purely discretionary. On the other hand, decisions made in the course of operating the project or endeavor were deemed non-discretionary and, thus, not immune under the discretionary-function exception, as those decisions were viewed as merely operational. In applying this test to the challenged acts or decisions, we acknowledged that "[t]he distinction between discretionary and operational functions is obscure."[26]

Thereafter, when considering whether law enforcement officers were entitled to discretionary-function immunity for their decisions or acts, we applied a discretionary-versus-ministerial test. Under that test, an officer's decisions or acts were immune from liability so long as they were made using personal deliberation, decision, or judgment; in contrast, ministerial decisions, " 'amounting only to obedience to orders, or the performance of a duty in which the officer is left no choice of his own,' "[27] were not immune under NRS 41.032(2).[28]

---

[25]*Arnesano v. State, Dep't Transp.*, 113 Nev. 815, 823-24, 942 P.2d 139, 144-45 (1997) ("[D]iscretionary immunity applies to the planning level of government, but not to the actual construction and operation of a project. . . . [T]he state's decision not to install barrier protection was an operational matter . . . not immune from liability . . . ."); *State v. Silva*, 86 Nev. 911, 913-14, 478 P.2d 591, 592-93 (1970) (concluding that decisions related to establishing and selecting inmates for an honor camp were discretionary, while the manner in which the camp was controlled and supervised was operational and not subject to discretionary-function immunity); *Harrigan v. City of Reno*, 86 Nev. 678, 681, 475 P.2d 94, 96 (1970) (distinguishing between decisions made at "the policy stage," where the discretionary-function exception applies, from decisions made at the "operational stage," and holding that the planning level decision to build a parking garage was a protected policy decision, while the omission of danger signs and guardrails in the parking garage was part of the operational phase of the project, not protected by discretionary immunity).

[26]*Silva*, 86 Nev. at 914, 478 P.2d at 593.

[27]*Maturi v. Las Vegas Metro. Police Dep't*, 110 Nev. 307, 309, 871 P.2d 932, 934 (1994) (quoting *Board of Co. Comm'rs v. Cirac*, 98 Nev. 57, 59, 639 P.2d 538, 539 (1982)).

[28]*Ortega v. Reyna*, 114 Nev. 55, 62, 953 P.2d 18, 23 (1998) (concluding that no civil liability attached to a state trooper's decision to arrest a driver for allegedly refusing to sign a traffic ticket because the decision to do so was a

Given the different tests this court has used to determine whether NRS 41.032(2) immunity applies, and the resulting inconsistent conclusions based on who made the decision or engaged in the act in question, we take this opportunity to clarify the test for evaluating claims of discretionary-function immunity under NRS 41.032(2). Because NRS 41.032(2) mirrors the Federal Tort Claims Act (FTCA), we turn to federal decisions to aid in formulating a workable test for analyzing claims of immunity under NRS 41.032(2).[29]

The purpose of both the FTCA and Nevada's waiver of sovereign immunity is "to compensate victims of government negligence in circumstances like those in which victims of private negligence would be compensated."[30] Consistent with this purpose, the United States Supreme Court has determined that discretionary-act immunity under the FTCA necessarily protects only those decisions " 'grounded in social, economic, and political policy.' "[31] This approach is also taken by the majority of state courts utilizing the FTCA framework for waiver of immunity and comports with our strict construction of limitations on the state's waiver of sovereign immunity.[32]

---

discretionary decision requiring personal deliberation and judgment and thus entitled to immunity under NRS 41.032(2)); *Maturi*, 110 Nev. at 309-10, 871 P.2d at 934 (determining that the police officers' decision to handcuff a person behind his back was a judgment call, entitled to discretionary-function immunity, rather than a ministerial act); *Parker v. Mineral County*, 102 Nev. 593, 595, 729 P.2d 491, 493 (1986) (concluding that a sheriff's department's decision not to respond to a report that a man was lying in the desert in need of assistance was immune from civil liability in a subsequent wrongful death action, because the department's decision was discretionary in that it involved personal judgment as to how the department's limited resources should be utilized).

[29]*See* 28 U.S.C. § 2680(a) (2000); *see also Scott v. Dep't of Commerce*, 104 Nev. 580, 583-84, 763 P.2d 341, 343 (1988) (noting that because NRS 41.032(2) and the discretionary-function exception in the FTCA are "practically identical," federal precedents are relevant in interpreting NRS 41.032(2)) (citing *Hagblom v. State Dir. of Motor Vehicles*, 93 Nev. 599, 602, 571 P.2d 1172, 1174 (1977); *Harrigan*, 86 Nev. at 681, 475 P.2d at 95); *State v. Webster*, 88 Nev. 690, 695, 504 P.2d 1316, 1319 (1972) (using federal FTCA jurisprudence to interpret NRS 41.032(2)).

[30]*Harrigan*, 86 Nev. at 680, 475 P.2d at 95 (citing *Indian Towing Co. v. United States*, 350 U.S. 61, 65-69 (1955)); Hearing on S.B. 185 Before the Assembly Judiciary Comm., 53d Leg. (Nev., March 29, 1965).

[31]*Berkovitz v. United States*, 486 U.S. 531, 537 (1988) (quoting *United States v. Varig Airlines*, 467 U.S. 797, 814 (1984)).

[32]*Nguyen v. State*, 788 P.2d 962, 964-65 (Okla. 1990) (noting that the majority of states utilizing the FTCA immunity framework provide discretionary-act immunity for initial policy and planning decisions, but not for "operational level decisions made in the performance of policy"); *see also Barner v. Leeds*, 13 P.3d 704, 709 (Cal. 2000) (holding that a public defender did not

■■■

In its most recent decision addressing the FTCA's discretionary-function exception, the United States Supreme Court, in *United States v. Gaubert*, clarified the scope of federal discretionary-act immunity.[33] Drawing on its previous decision in *Berkovitz v. United States*,[34] the Court set forth a two-part test. Under this test, referred to as the *Berkovitz-Gaubert* test, acts are entitled to discretionary-function immunity if they meet two criteria. Under the first criterion, the acts alleged to be negligent must be discretionary, in that they involve an "element of judgment or choice."[35] If the challenged conduct meets this first criterion because it involves an element of judgment or choice, the court must consider the second criterion: "'whether [the] judgment is of the kind that the discretionary-function exception was designed to shield.'"[36] The focus of the second criterion's inquiry is not on the employee's "subjective intent in exercising the discretion conferred by statute or regulation, but on the nature of the actions taken and on whether they are susceptible to policy analysis."[37]

---

enjoy discretionary-act immunity for decisions forming the basis of a malpractice action, as discretionary-act immunity is reserved for basic policy decisions "committed to coordinate branches of government" and provides "no basis for immunizing lower level decisions that merely implement a basic policy already formulated" (internal quotation marks omitted)); *Lee v. DHRS*, 698 So. 2d 1194, 1198 (Fla. 1997) (noting that discretionary-act immunity applies only to "discretionary policy-level functions"); *Terwilliger v. Hennepin County*, 561 N.W.2d 909, 912 (Minn. 1997) (noting that discretionary-act immunity does not apply to "[o]perational level decisions . . . [that] involve decisions relating to the ordinary day-to-day operations of the government"); *Mahan v. N.H. Dept. of Admin. Services*, 693 A.2d 79, 82 (N.H. 1997) (stating that in the context of the discretionary-function exception, "[w]e distinguish policy decisions involving the consideration of competing economic, social, and political factors from operational or ministerial decisions required to implement the policy decisions"); *Clifford v. City of Clatskanie*, 131 P.3d 783, 791 (Or. Ct. App. 2006) (noting the discretionary-function exception applies only to actions that are "the result of a *choice*, that is, the exercise of judgment [and] that choice must involve public *policy*, as opposed to the routine day-to-day activities of public officials" (internal quotation marks omitted)); *Petersen v. State*, 671 P.2d 230, 240 (Wash. 1983) (noting that discretionary-act immunity is an "extremely limited exception," and applies only to basic policy decisions).

[33]499 U.S. 315, 325 (1991).

[34]486 U.S. 530 (1988).

[35]*Id.* at 536. We note that under Nevada law, some acts that do not involve an element of judgment or choice may also be entitled to immunity. *See* NRS 41.032(1) (providing that no action may be brought "[b]ased upon an act or omission of [a state] officer, employee or immune contractor, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation is valid, if the statute or regulation has not been declared invalid by a court of competent jurisdiction").

[36]*Gaubert*, 499 U.S. at 322-23 (quoting *Berkovitz*, 486 U.S. at 536).

[37]*Id.* at 325.

Thus, the court need not determine that a government employee made a conscious decision regarding policy considerations in order to satisfy the test's second criterion.[38]

Given the interplay between the criteria of the *Berkovitz-Gaubert* test, certain acts, although discretionary, do not fall within the discretionary-function exception's ambit because they involve "negligence unrelated to any plausible policy objectives."[39] For example, a government employee who falls asleep while driving her car on official duty is not protected by the exception because her negligent judgment in falling asleep "cannot be said to be based on the purposes that the regulatory regime seeks to accomplish."[40] Because the FTCA's discretionary-function exception is not a bright-line rule,[41] federal courts applying the *Berkovitz-Gaubert* test must assess cases on their facts, keeping in mind Congress' purpose in enacting the exception: "to prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort."[42] Thus, if the injury-producing conduct is an integral part of governmental policy-making or planning, if the imposition of liability might jeopardize the quality of the governmental process, or if the legislative or executive branch's power or responsibility would be usurped, immunity will likely attach under the second criterion.[43]

This federal test is helpful in differentiating between true policy decisions protected by discretionary-act immunity and other unprotected acts. We therefore adopt the *Berkovitz-Gaubert* approach and clarify that to fall within the scope of discretionary-act immunity, a decision must (1) involve an element of individual judgment

---

[38]*See Kiehn v. U.S.*, 984 F.2d 1100, 1105 (10th Cir. 1993).

[39]*Coulthurst v. U.S.*, 214 F.3d 106, 111 (2d Cir. 2000).

[40]*Gaubert*, 499 U.S. at 325 n.7.

[41]*See Varig Airlines*, 467 U.S. at 813 (noting that it is "impossible . . . to define with precision every contour of the discretionary-function exception"); *Rosebush v. U.S.*, 119 F.3d 438, 444-45 (6th Cir. 1997) (Merritt, J., dissenting) (opining that the second part of the *Berkovitz-Gaubert* test "presents an ambiguous standard that is difficult to apply and that has produced a large number of inconsistent holdings in the circuit and district courts").

[42]*Varig Airlines*, 467 U.S. at 814; *see Gaubert*, 499 U.S. at 323; *Caban v. United States*, 671 F.2d 1230, 1233 (2d Cir. 1982) (explaining that the exception "protects the principles embodied in the separation of powers doctrine by keeping the judiciary from deciding questions consigned to the executive and legislative branches of the government").

[43]*Horta v. Sullivan*, 4 F.3d 2, 19 (1st Cir. 1993).

or choice and (2) be based on considerations of social, economic, or political policy. In this, we clarify that decisions at all levels of government, including frequent or routine decisions, may be protected by discretionary-act immunity, if the decisions require analysis of government policy concerns. However, discretionary decisions that fail to meet the second criterion of this test remain unprotected by NRS 41.032(2)'s discretionary-act immunity.

Under the *Berkovitz-Gaubert* test, the decision to create and operate a public hospital and the college of medicine are the type of decisions entitled to discretionary-function immunity, because those decisions satisfy both prongs of the *Berkovitz-Gaubert* test; namely, they involve elements of judgment and choice, and they relate to social and economic policy. But, while a physician's diagnostic and treatment decisions involve judgment and choice, thus satisfying the test's first criterion, those decisions generally do not include policy considerations, as required by the test's second criterion.[44] In this case, as Dr. Martinez did not engage in policy-making decisions in his treatment of Mr. Maruszczak, he is not entitled to immunity from suit under NRS 41.032(2).[45]

---

[44]*See Sigman v. U.S.*, 217 F.3d 785, 795 (9th Cir. 2000) (observing that it is a "well-established principle that the discretionary function exception is intended to shield the government from liability for the exercise of governmental discretion, not to shield the government from claims of garden-variety medical malpractice"); *Fang v. U.S.*, 140 F.3d 1238, 1241-42 (9th Cir. 1998) (holding that the United States was immune from claims related to discretionary policy decisions involving the allocation of medical personnel and resources in the national parks, but not claims related to "actual administration of medical care by its employees"); *Tarasoff v. Regents of University of California*, 551 P.2d 334, 350 (Cal. 1976) (holding that while a therapist's decision whether to warn his patient's victim of impending harm required exercise of individual judgment and discretion, the decision was not the type of policy decision protected by discretionary-act immunity); *Terwilliger*, 561 N.W.2d at 913 (noting that "day-to-day [medical] treatment decisions—despite the professional discretion involved in their making—are operational decisions that do not ordinarily fall within [discretionary-act] immunity").

[45]*See, e.g., Lather v. Beadle County*, 879 F.2d 365, 367 (8th Cir. 1989) (allegedly negligent medical judgment not covered by discretionary-function exception); *Collazo v. U.S.*, 850 F.2d 1, 2 (1st Cir. 1988) (concluding that a claim that a government doctor rendered negligent medical treatment, unaccompanied by any discretionary, policy-based conduct, falls outside the parameters of the discretionary-function exception, which does not apply to professional discretion); *see also Goodman v. City of Le Claire*, 587 N.W.2d 232, 238 (Iowa 1998) (adopting the *Berkovitz-Gaubert* two-step analysis for determining whether a challenged action falls within the discretionary-function exception, while recognizing that adoption of the test represents a "significant shift from the planning/operational bright line test [the court had] been using" and noting that "*Gaubert* makes clear, [Iowa]—like many other courts—[has] misinterpreted *Dalehite* [*v. United States*, 346 U.S. 15 (1953)] as holding that the discretionary-function exception does not reach any decisions made at the operational level").

Moreover, to hold that public professionals, such as medical doctors, are immune from any suit arising from the performance of acts of professional discretion would unacceptably leave a large number of clients and patients with no form of recourse against individuals who fail to act according to the reasonable standards of their profession. As many individuals seeking treatment or services from public providers cannot afford the services of private practitioners, this result would also unfairly discriminate against indigent patients and clients, who would be required to accept substandard medical treatment or professional services without protest, while patients who received private care or services could recover in a suit for malpractice. Such a result would be intolerable under our prior cases, including *Harrigan*, and the state's consent in NRS 41.031 subject to a statutory limit on damages liability, "to have its liability determined in accordance with the same rules of law as are applied to civil actions against natural persons and corporations."[46] Thus, given that Nevada's waiver of sovereign immunity is to be broadly applied, we conclude that Dr. Martinez's proposed interpretation of discretionary-act immunity would violate the intent of the Legislature in enacting NRS 41.031.[47]

While Dr. Martinez is not entitled to discretionary-function immunity, his status as a state employee entitles him to the statutory cap on tort damages set forth in NRS 41.035(1). In light of our conclusion that NRS 41.035(1) applies to Dr. Martinez, we now address the estate and amicus curiae's constitutional challenges to that provision.

## Constitutionality of NRS 41.035(1)

The estate and amicus assert that applying the statutory cap on damages in NRS 41.035(1) to all governmental entities, regardless of the nature of the activity performed by that entity (*i.e.*, proprietary versus governmental), violates due process and equal protection guarantees under the Nevada and United States Constitutions.[48] In reviewing the estate's constitutional challenge to NRS 41.035(1), this court presumes that the statute is valid; in order to

---

We also note that counsel for Dr. Martinez conceded at oral argument that his primary concern on appeal was "capped" liability under NRS 41.035(1), not whether Dr. Martinez enjoyed absolute immunity under the "discretionary act" provision of NRS 41.032(2).

[46]NRS 41.031(1).

[47]*Silva*, 86 Nev. at 914, 478 P.2d at 593.

[48]Nev. Const. art. 1, § 8(5); *id.* art. 4, § 21; U.S. Const. amend. XIV.

overcome that presumption, the estate must make a " 'clear showing' " regarding the statute's invalidity.[49]

In *State v. Silva*, this court rejected an argument that the statute's expression of the damage cap as an amount, rather than as a percentage, unconstitutionally differentiated between similarly situated claimants in violation of the Equal Protection Clause.[50] We noted that the argument failed to differentiate between the right to recover and the amount of recovery, and that the recovery amount is always uncertain and subject to remarkable variations among claimants.[51] From this, we concluded that equal treatment with regard to damages was unachievable and that, accordingly, the Equal Protection Clause was not implicated by NRS 41.035(1)'s limitation on damages.[52]

More recently, in *Arnesano v. State, Department Transportation*, this court entertained a similar equal protection challenge to NRS 41.035(1), as well as a substantive due process challenge.[53] We first rejected the equal protection challenge, citing *Silva* for support.[54] We then addressed the substantive due process challenge and rejected it because the statutory cap furthered the legitimate state interest in protecting the state treasury.[55]

The estate and amicus, however, provide a new variation in their equal protection attack on the validity of "capped" damages. Relying upon the Utah Supreme Court decision in *Condemarin v. University Hospital*,[56] the estate and amicus assert that capping damages for public physicians who, in competition with private physicians, provide commonly available healthcare services on a fee-for-service basis, violates constitutional equal protection and due process principles because no rational basis exists for treating public and private physicians differently. We disagree. Under this court's precedent in *Arnesano*, protecting the state treasury remains a legitimate state interest, thus providing a rational basis for capping damages at $50,000 for allegedly negligent acts committed within the scope of state employment. Going further, capped damages also advance a legitimate state interest in encouraging quali-

---

[49]*Ottenheimer v. Real Estate Division*, 97 Nev. 314, 315-16, 629 P.2d 1203, 1204-05 (1981) (quoting *Damus v. County of Clark*, 93 Nev. 512, 516, 569 P.2d 933, 935 (1977)).

[50]86 Nev. 911, 916, 478 P.2d 591, 593 (1970).

[51]*Id.*

[52]*Id.*

[53]113 Nev. 815, 819, 942 P.2d 139, 142 (1997).

[54]*Id.*

[55]*Id.*

[56]775 P.2d 348 (Utah 1989).

fied professionals to accept state employment to serve the people of Nevada. We therefore discern no reason to depart from our precedent upholding the constitutionality of NRS 41.035(1). Accordingly, we reject the instant challenge to this statutory limitation on damages.

## CONCLUSION

We conclude that Dr. Martinez is not immune from liability under NRS 41.032(2) but that any damage award against him will be limited by NRS 41.035(1), given his status as a state employee. We therefore reverse the district court's declaratory judgment.

GIBBONS, HARDESTY, PARRAGUIRRE, DOUGLAS, CHERRY and SAITTA, JJ., concur.