TAO, J., concurring in part and dissenting in part:
I agree that the majority properly resolves the issue of sovereign immunity as the parties have framed it. But I believe that the parties have framed this case all wrong.
In the words of a fictional television police detective, "all the pieces matter." (Detective Lester Freamon, The Wire, HBO 2001). This is especially true when dealing with the "Byzantine complexity of sovereign-immunity law," Hall v. McRaven, 508 S.W.3d 232, 245 (Tex. 2017) (Willett, J., concurring), a field which includes a general rule of immunity, subject to a partial statutory waiver, subject to exceptions to the waiver, within which lie yet more exceptions to those exceptions. When working through these layers of statutory text, we must take care that "no part of [the] statute should be rendered nugatory, nor any language turned to mere surplusage, if such consequences can properly be avoided." Indep . Am. Party v. Lau, 110 Nev. 1151, 1154, 880 P.2d 1391, 1392 (1994) (quotation marks omitted); see Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 176 (2012).
The parties focus their briefing on whether the "discretionary function" exception applies. But in doing so, they overlook critical pieces of the analysis that should apply to this appeal that, when properly applied, lead to a very different result than they propose. Normally, we limit ourselves to the arguments that the parties make and the relief they request, because the parties are generally allowed to frame and present their own case the way they want. But when that approach *57 causes us to gloss over important parts of a statute that would otherwise apply-thereby suggesting to other parties or courts tackling this issue that the right thing to do is to skip over those statutory provisions as well-then "[t]he ability of this court to consider relevant issues sua sponte in order to prevent plain error is well established. Such is the case where [clearly controlling law] was not applied by the trial court." Bradley v. Romeo, 102 Nev. 103, 105, 716 P.2d 227, 228 (1986) (internal citation omitted); see Mardian v. Greenberg Family Tr., 131 Nev. 730, 733-34, 359 P.3d 109, 111 (2015) (on de novo review of denial of summary judgment, the court is not limited to only what the parties expressly argue: "While the arguments made by the parties focus on Nevada law, the issue of whether the Arizona law should have been applied must also be addressed."); Nev. Power Co. v. Haggerty, 115 Nev. 353, 365 n.9, 989 P.2d 870, 877-78 n.9 (1999) (explaining that the court would resolve an issue of statutory interpretation not litigated below "in the interests of judicial economy").
I therefore write separately to address the way I think this case should have come out had the parties properly understood the statute in all of its component parts. "[T]he bottom line is understanding the process. If you don't understand the process, you'll never reap the rewards." Donald J. Trump, How to Get Rich 74 (2004).
Nevada's statutory waiver of sovereign immunity is set forth in NRS 41.031, which specifies that the State consents to waive immunity "in accordance with the same rules of law as are applied to civil actions against natural persons and corporations." NRS 41.031(1). The parties ignore this statutory language-the language that initially defines the scope and reach of any waiver of immunity-and focus instead on a later subsection that contains a specific exception to the waiver, namely, the discretionary function exception described in NRS 41.032(2). But focusing on whether an exception to the waiver applies only makes sense if it's clear that immunity has been waived in the first place. In this case, that's not clear at all. When the statute is properly analyzed in its entirety, I would affirm the district court's grant of summary judgment in its entirety and I therefore respectfully concur in part and dissent in part.
I.
The United States is sovereignly immune and no citizen can sue it for any alleged negligence unless it consents to such suit. Prior to 1946, the only avenue through which a private citizen could seek redress for an injury inflicted by governmental negligence was to petition Congress for compensation through a "private bill."[1] See Feres v. United States, 340 U.S. 135, 139-40, 71 S.Ct. 153, 95 L.Ed. 152 (1950). Then, following the crash of a B-25 into the Empire State Building during foggy weather, Congress statutorily enacted the Federal Tort Claims Act (FTCA), which "constitutes a limited waiver by the United States of its sovereign immunity and allows for a tort suit against the United States under specified circumstances." Hamm v. United States, 483 F.3d 135, 137 (2d Cir. 2007) (quotation marks omitted); see 28 U.S.C. § 2674. This waiver is not complete; "the United States can be sued only to the extent that it has waived its immunity." United States v. Orleans, 425 U.S. 807, 814, 96 S.Ct. 1971, 48 L.Ed.2d 390 (1976).
States, too, possess sovereign immunity, unless they waive it statutorily. Nevada's statutory waiver of sovereign immunity under NRS 41.032"mirrors" the scope of the federal waiver under the FTCA, and the Nevada Supreme Court has expressly adopted federal judicial precedent applying the FTCA. See Martinez v . Maruszczak, 123 Nev. 433, 444, 168 P.3d 720, 727 (2007). Under both, immunity is waived only to the extent expressly outlined by statute and "must be 'construed strictly in favor of the sovereign' and not 'enlarge[d] ... beyond what the language requires.' "
*58 U.S. Dep't of Energy v. Ohio , 503 U.S. 607, 615, 112 S.Ct. 1627, 118 L.Ed.2d 255 (1992) (internal citation omitted).
In analyzing the scope of a waiver, two competing considerations are at stake. On the one hand is the foundational idea that citizens have inherent liberty to pursue their vision of happiness free from government interference or coercion, and whenever arbitrary or irrational-here, allegedly negligent-governmental conduct inflicts injury on the innocent and unsuspecting, courts ought to rein in the conduct and provide fair redress to the victims. And what could be more arbitrary than a case like this which alleges that a government vehicle exercising official government power negligently plowed through a major intersection, quite possibly in violation of law and policy regarding police sirens, inflicting serious physical injury on an unsuspecting motorist? On the other hand, though, is the idea that overly abundant lawsuits instill "legal fear" even in those who are not sued, chilling initiative and inhibiting "people [from] doing what they know is right because they do not feel free to do so." Philip K. Howard, Is Civil Litigation a Threat to Freedom?, 28 Harv. J. Law & Pub. Pol'y 97, 102 (2004). I would think that if there's anyone in our society whom we don't want to feel inhibited in vigorously doing what they know is right, it ought to be a police officer racing to stop a felony in progress.
Here is the line that must be straddled in a case like this: we want police officers to courageously take risks and perhaps even engage in some level of derring-do to shield us from danger; but we also want any passersby that they irresponsibly injure along the way to have access to fair redress. The question becomes how to achieve one without chilling the other. If we go too far in immunizing government, then government officials get to act with impunity: "[t]he doctrine of sovereign immunity, by insulating imprudence, is innately unfair to those wronged." Hall, 508 S.W.3d at 245 (Willett, J., concurring). But if we go too far in the other direction and allow too many suits to create too much liability, then every injury warrants a payout and we drive up costs for everyone, since "[e]ven frivolous claims require the ... Government to expend administrative and litigation costs, which ultimately fall upon society at-large." United States v. Kwai Fun Wong, --- U.S. ----, ----, 135 S.Ct. 1625, 1639, 191 L.Ed.2d 533 (2015) (Alito, J., dissenting). Worse, the police might not respond so quickly the next time someone dials 9-1-1, and we all end up paying more taxes for less effective service.
II.
To resolve this dilemma and balance these competing interests, the Nevada Legislature enacted NRS 41.031, embodying a general ''Waiver of Sovereign Immunity." That general waiver is followed by certain "Conditions and Limitations on Actions" set forth in NRS 41.032 et seq. , including the "discretionary function" exception of NRS 41.032(2). Under this exception, when immunity has generally been waived, tort suits alleging negligence by government actors are permitted to proceed unless the governmental action: (1) involves an element of individual judgment or choice and (2) is based on considerations of social, economic, or political policy. Martinez , 123 Nev. at 446-47, 168 P.3d at 729 (citing Berkovitz v. United States, 486 U.S. 531, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988) ; United States v . Gaubert , 499 U.S. 315, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991) ).
In analyzing the effect of these statutes on the case at hand, the parties jump straight to the "discretionary function" exception of NRS 41.032(2) and argue whether it applies throughout their briefing. But I would take a different approach and start in an entirely different place: at the very beginning.
To me, the proper starting point for actions alleging negligence by police officers is here: by statute, Nevada consents to waive immunity "in accordance with the same rules of law as are applied to civil actions against natural persons and corporations." NRS 41.031(1). The purpose of this waiver is to "compensate victims of government negligence in circumstances like those in which victims of private negligence would be compensated." Martinez, 123 Nev. at 444, 168 P.3d at 727. This isn't just a broad statement of intent. It's a specific legal doctrine that limits the scope of the waiver. It means that *59 Nevada's waiver only extends to governmental actions "like those" that private citizens could also be sued for, and the government is liable in the same way that a private actor would be. Under the identical language of the FTCA, federal courts have held that there is no waiver of immunity "for claims against the government based on governmental action of the type that private persons could not engage in and hence could not be liable for under local law." Liranzo v. United States, 690 F.3d 78, 86 (2d Cir. 2012) (quotation marks omitted).
This matters here because private citizens can do a lot of things that governments also do, but they don't engage in police work. Quite to the contrary, much police work involves things that are not anything at all "like" things that private citizens can legally do. See Stanton R. Gallego, Note, An Examination of the Federal Tort Claims Act's "Private Person" Standard as It Applies to Federal Law Enforcement Activities, 76 Brook. L. Rev. 775, 784 (2011) ("no private citizen is truly comparable to a law enforcement officer"). Many police activities represent "quintessential examples of government discretion in enforcing the criminal law." Pooler v . United States, 787 F.2d 868, 871 (3d Cir. 1986), abrogated on other grounds by Millbrook v. United States, 569 U.S. 50, 133 S.Ct. 1441, 185 L.Ed.2d 531 (2013) ; see Kelly v. United States , 924 F.2d 355, 362 (1st Cir. 1991). Thus, when the conduct targeted by suit involves law enforcement activity, courts must apply a different doctrine altogether, commonly referred to as the "private analogue" doctrine, and unfortunately expressed in rather tortured phrasing: immunity is waived only with respect to police actions that would result in liability if those actions were performed by a private actor "under like circumstances." Indian Towing Co. v. United States, 350 U.S. 61, 64, 76 S.Ct. 122, 100 L.Ed. 48 (1955) ; see Liranzo, 690 F.3d at 84-89. Or, described in a somewhat different but no less tortured manner: if an "analogous form of liability exists" had the same negligence been committed by a private actor, then sovereignty has been waived and the state may be sued for the negligent conduct in the exact same way that the private actor could have been. United States v . Muniz, 374 U.S. 150, 159-60, 83 S.Ct. 1850, 10 L.Ed.2d 805 (1963) ; see United States v. Olson, 546 U.S. 43, 45-46, 126 S.Ct. 510, 163 L.Ed.2d 306 (2005). But if the targeted conduct was something of "the type that private persons could not engage in," then immunity has not been waived and the state may not be sued. Liranzo, 690 F.3d at 86. What matters is not the status of the actor as either a law enforcement officer or something else, but rather "the nature of the conduct" and whether a private analogue exists or not. United States v . S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines), 467 U.S. 797, 813, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984).
The structure of the statute is thus: the private analogue test of NRS 41.031(1) determines if and when sovereign immunity may have been initially waived. If the government action has no private analogue under NRS 41.031(1), then there is no waiver and the inquiry ends. Only if the government action has a private analogue can immunity be waived, and even then only potentially so. Even where such an analogue exists, the inquiry doesn't stop there but rather continues next to the listed exceptions to immunity, including the discretionary function exception, which restores immunity if the action sprang from the exercise of government discretion as defined in NRS 41.031(2).
The point is to start with whether a waiver of sovereign immunity is even possible under NRS 41.031(1) before proceeding to whether a specific exception to that waiver exists under NRS 41.031(2). And this is where I think the parties get the analysis wrong.
III.
Structurally, the first question at hand is whether Nevada's waiver of immunity applies at all to allegations of police negligence like those in this case. If it does not, then we don't need to even bother with asking whether the discretionary function exception applies. If the larger rule itself doesn't apply, there's no need to search for an exception within the rule designed to make the rule apply even less.
Rather than discuss how this case fits into the overarching framework of the statute, *60 the parties instead bore in on Martinez v. Maruszczak , 123 Nev. 433, 168 P.3d 720 (2007). It's no wonder that they did so when Nevada cases addressing sovereign immunity are few and far between, and Martinez is about the best we have. But Martinez involved an action in medical malpractice against a government physician. To resolve the question of sovereign immunity, the Nevada Supreme Court adopted the federal discretionary function test that would have applied under the FTCA had the medical malpractice action been brought against the federal government. Id . at 435, 168 P.3d at 722.
The parties here assume that this is the test that must be applied to this lawsuit. But it's not. Under the FTCA, the discretionary function test is an exception to the general waiver of sovereign immunity, not the entire rule, and the general rule doesn't apply to most law enforcement actions. Martinez doesn't explain this well because it doesn't expressly address whether the federal private analogue exception is also incorporated into Nevada's statutes. But then again, as a case arising in medical malpractice, Martinez didn't involve any kind of law enforcement activity, so there wasn't any reason for the court to gratuitously discuss or adopt a test that had nothing to do with the case at hand. For the kind of malpractice suit at stake in Martinez, the discretionary function exception was all that was needed.
But for the kind of lawsuit we have here, it's the wrong place to start. It seems to me that the questions raised by this appeal are these: whether this is an action in general negligence, or rather, an action involving a "law enforcement" activity; and, if the latter, whether Nevada did, or ought to, adopt the federal private analogue test to analyze whether the state is immune from suit for injuries arising from those actions. Martinez doesn't answer these questions one way or the other. But, notably, Nevada's waiver of sovereign immunity includes statutory language virtually identical to the language in the FTCA that the private analogue test derives from: like the FTCA, Nevada's waiver is designed "to compensate victims of government negligence in circumstances like those in which victims of private negligence would be compensated." Martinez, 123 Nev. at 444, 168 P.3d at 727 (quotation marks omitted); see 28 U.S.C. § 1364(b)(1). It seems self-evident to me that if the language of one statute tracks that of the other this closely then the two statutes ought to mean exactly the same thing, and consequently the private analogue test applies to claims against Nevada as much as it applies to claims against the federal government.
IV.
Some police actions involve conduct that can easily be committed by private citizens; for those actions, immunity has been waived and the police can be held liable in exactly the same way that the private actor would under state law. For example, a police department that refuses to clean up coffee spills on its floor in a reasonable manner and thereby causes a passerby to slip and fall has committed negligent conduct that any private person or entity could just as easily commit. So it can be sued and, if found negligent, must pay damages just as if the same thing happened in a private office building or restaurant. Under Nevada tort law, the fact that the negligence involved the police is entirely irrelevant to the legal analysis; the legal analysis under state tort law is exactly the same whether the conduct was committed by a police officer in a police station or by a private innkeeper in the lobby of a hotel.
But a good number of law enforcement activities involve things that no private person is permitted to engage in and for which there is no private analogue. For example, police officers can trespass on private property to chase fleeing felons without fear of trespass suits; violently kick down doors and enter homes to execute no-knock search warrants without being charged with the felony crime of home invasion; and violate any number of traffic laws while responding to emergencies. Private citizens can do none of these things, at least not without serious legal repercussions ensuing. There's an easy comparison to be made between a coffee spill on a police precinct floor and a coffee spill on a private office building floor. But there's no such comparison to be made when dealing *61 with officers chasing after fleeing felons, interrogating witnesses or suspects, collecting forensic evidence from crime scenes, or negotiating for the release of hostages. Thus, no private analogue exists for decisions that lie "at the core'' of law enforcement activity, like how a police officer decides to investigate a crime. Kelly, 924 F.2d at 361-62 ; see Doherty v. United States, 905 F.Supp. 54, 56 (D. Mass. 1995) (holding that government is immune from suit for decisions on how and when to seek a search warrant). Those actions involves things that police officers can do and private actors cannot and for which the government has not waived immunity and cannot be found liable under state negligence law.
Applying these principles to the case at hand, the question becomes this: is there a private analogue for the law enforcement conduct targeted by this lawsuit? If the answer is no, then sovereign immunity has not been waived, we lack subject-matter jurisdiction over the allegations, and this case cannot proceed. Jurisdiction exists only if the answer is yes.[2]
V.
The crux of this lawsuit alleges that, while responding to an emergency call of "shots fired," Sergeant Cargile sped through a red light and entered an intersection without using his sirens to warn other drivers in violation of police policy. Glover-Armont happened to be entering the intersection perpendicularly on a green light and the two cars crashed. From these factual allegations, Glover-Armont specifically identifies four claims for relief: (1) negligence arising from Cargile's failure to use lights and sirens when entering a busy intersection against a red traffic light; (2) failure to exercise due care while driving; (3) negligent supervision and hiring by the police department; and (4) negligent entrustment of a police vehicle to Cargile.
I would analyze these claims for relief as follows. I agree with my colleagues in their conclusions about the third and fourth claims, although I would analyze them somewhat differently. They both seem to me to have simple and straightforward private analogues, involving the exercise of ordinary care in situations not unique to law enforcement. Police departments must exercise as much reasonable diligence when hiring, training, and supervising employees and entrusting them to drive employer-owned vehicles as does any private employer. Accordingly, sovereign immunity has been generally waived for these claims, and the next question is whether the targeted conduct involves the exercise of discretion under the "discretionary function" exception to the general waiver. I agree with my colleagues here. From what I see in the record, though, I harbor serious doubts whether Glover-Armont can ultimately prevail on the merits of these claims. For starters, the doctrine of "negligent entrustment of a motor vehicle" operates to impose liability upon one who "knowingly entrusts a vehicle to an inexperienced or incompetent person, such as a minor child unlicensed to drive a motor vehicle." Zugel v. Miller, 100 Nev. 525, 527, 688 P.2d 310, 312 (1984). I have trouble seeing how that could possibly apply to letting a police officer drive his assigned police cruiser on duty. But the merits of those claims are not presently before us. In the end, whether Glover-Armont can ultimately prevail on those claims or not, I agree that the State is not sovereignly immune from her efforts to try.
I diverge from my colleagues, however, with respect to the first and second claims. I would conclude that there is no private analogue for these claims, and therefore no need exists to even address whether the discretionary function exception applies. The State is simply immune whether it engaged in a discretionary function or not.
*62 On appeal, Glover-Armont characterizes her claims as arising from a simple car crash that could have involved anyone, police or not. But her own factual allegations undermine her argument. Some car crashes involving police vehicles have straightforward private analogues: suppose a police car, not responding to an emergency, carelessly veers through a crosswalk and injures a pedestrian. In that event, the police car should be subject to the same principles of liability that apply to any private citizen because the scenario involves the kind of simple negligence that anyone can commit regardless of whether the vehicle in question was a police cruiser or a family station wagon.
But as detailed by Glover-Armont's complaint, summary judgment evidence, and briefing both below and on appeal, this case isn't so simple. The act that Glover-Armont specifically identifies as having been negligent is not simply that Sergeant Cargile drove carelessly in some way that any private actor could have. It's considerably more specific than that: it's that Cargile raced at high speed through an intersection against a red light without activating police warning sirens to clear civilians out of the way as police department policy specifically required. This is wholly unlike anything that a private citizen can do. Private actors can't legally speed on public roads (except to avoid some kind of imminent danger to them, not present here). They can't legally enter intersections against red lights (again, except to avoid some kind of imminent danger not present here). They don't have, and can't legally ever use, police lights and sirens in any shape or form. They aren't governed by police department policies, or any civilian analogue thereto, regarding the use of police lights and sirens in traffic. They don't have to make split-second decisions on the best way to quickly get to the scene of an active shooting before the victim dies or the criminal escapes. There is no private analogue of any sort for the negligence alleged here. Consequently, I would conclude that no private analogue exists for the negligence that Glover-Armont alleges in her first and second claims for relief, and sovereign immunity has not been waived for these claims to proceed.
VI.
Glover-Armont nonetheless argues that because a specific Nevada statute ( NRS 484B.700 ) requires police officers to act with due care, then the Legislature must have intended to allow them to be sued when they do not, effectively creating an implied waiver to the larger rule of sovereign immunity. But that's too broad. There's no reason to read the two doctrines as necessarily being in tension with each other; indeed, when examining statutes, we're supposed to do the opposite and read them in harmony whenever possible. See Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 180 (2012) (Statutes should be "interpreted in a way that renders them compatible, not contradictory."). Here, the two statutes work together and complement each other quite nicely. A police officer can violate NRS 484B.700 in a way that lends itself to a private analogue under NRS 41.031(1). But a police officer can also violate NRS 484B.700 in a way that has no private analogue under NRS 41.031(1). When the former happens, NRS 484B.700 permits a lawsuit against the government. When the latter happens, NRS 41.031(1) prohibits a lawsuit against the government. It's that simple, and there's no need to labor for anything more elaborate.
VII.
For these reasons, I join my colleagues in remanding the third and fourth claims for relief, but would affirm the district court's grant of summary judgment with respect to Glover-Armont's first and second claims for relief.

As a recent example, Congressional action was required for "downwinders" to receive compensation for exposure to radiation from atomic bomb testing at the Nevada Test Site during the 1950s, because the United States has not waived sovereign immunity for any injuries arising from the effects of military weapons testing.

Adding to the complexity is that the federal circuit courts of appeal have split in various different ways in how the "private analogue" test should be applied to various types of conduct. See Stanton R. Gallego, Note, An Examination of the Federal Tort Claims Act's "Private Person" Standard as It Applies to Federal Law Enforcement Activities, 76 Brooklyn L. Rev. 775, 788-801 (2011) (discussing circuit split). Fortunately, however, the facts of this case fall so clearly within the area of uniquely governmental law enforcement activity having no private analogue that the federal circuit split doesn't matter much.