(2008)
LaKisha NEAL-LOMAX; LaKisha Neal-Lomax as parent and guardian of Joshua William Lomax; LaKisha Neal-Lomax as parent and guardian of Aliaya Tierraee Lomax; Juanita Carr as parent and guardian of Inique Alazya Lomax, and Joyce Charleston, individually and as Special Administrator of the Estate of William D. Lomax, Jr., Plaintiffs,
v.
LAS VEGAS METROPOLITAN POLICE DEPARTMENT; Officer Reggie Rader; Taser International, Inc., an Arizona corporation; and Taser International, Inc., a Delaware foreign corporation, Defendants.
No. 2:05-CV-01464-PMP-RJJ.
United States District Court, D. Nevada.
September 2, 2008.

ORDER
PHILIP M. PRO, District Judge.
Presently before the Court is Defendants Las, Vegas Metropolitan Police Department ("LVMPD") and Officer Reggie Rader's ("Rader") Motion for Summary Judgment (Doc. # 246), argued on June 9, 2008.

I. BACKGROUND
This case arises out of the death of William Lomax ("Lomax") after a struggle with police and security officers during which LVMPD police officer Rader used a Taser on Lomax. The Taser model X26z is a hand-held conducted energy weapon that looks like a handgun. (LVMPD & Officer Rader's Mot. for Summ. J. [Doc. # 246, "Mot."], Ex. Q at 5, 11, & slides at 5-9.) The Taser has two modes of operation. (Mot., Ex. E at 186.) In one mode, the Taser shoots out probes which are attached to the Taser device by wires. (Id. at 187.) If the probes make contact with a person and the Taser is activated, it delivers an electric shock through the wires into the person. (Id.) In this mode, the Taser overrides the central nervous system and incapacitates the entire body. (Id. at 183, 199.) In the drive stun mode, the Taser is physically placed in contact with the person and discharged. (Id. at 188.) The drive stun mode is used for pain compliance and works only on the area of the body to which the Taser is applied. (Id.)
The Taser delivers short electrical pulses lasting 100 microseconds, delivering 19 pulses per second for the first two seconds, and then dropping to 15 pulses per second while discharging. (Def. Taser Int'l, Inc.'s Global App. I, Ex. 1 at 11-12; Mot., Ex. E at 200.) Each operation of the Taser delivers approximately 50,000 volts, 26 watts, and 0.162 amps of electrical energy. (Mot., Ex. E at 183; Ex. Q at 21.) Although the Taser is capable of producing 50,000 peak arcing volts, the 50,000 volts do not enter a person's body upon application of the Taser device. (Def. Taser Int'l, Inc.'s Global App. I, Ex. 1 at 5, 8.) Rather, 1,200 peak volts, 400 volts average enter the person's body over the duration of the Taser pulse. (Id.)
The Taser is set to discharge for five seconds for each application of the trigger, but the operator can control how long the Taser is activated. (Mot., Ex. E at 192; Ex. Q at 18.) For example, if the person using the Taser holds down the trigger, the device will continue to discharge until he releases the trigger or the battery runs out. (Mot., Ex. E at 197.) Tasers may be attached to a computer to produce a readout of whether, when, and for how long the Taser was used. (Id. at 190.)
To carry and operate a Taser, LVMPD officers must be trained on the device.[1] (Id. at 182-83.) LVMPD's training program on Tasers as it existed at the relevant time stated the Taser is safe and less than lethal. (Mot., Ex. Q.) According to the training program, the Taser would not affect involuntary muscles, nervous tissue, cardiac pumping, or cause electrocution. (Id. at 19.) The training program advised of possible risks associated with Taser use, including causing minor burns, igniting flammable liquids or using it in a combustible environment, possible eye injury from the probes, muscle contractions that may affect high risk persons such as pregnant women, and secondary injuries due to falling. (Id.) LVMPD policy indicated officers should not use the Taser on pregnant women or the elderly absent compelling reasons to do so. (Mot., Ex. Q, Procedural Order PO-XX-03 at 1.)
The training program indicated that the Taser does not interfere with heart rhythm, and cited to a pig study which stimulated pig hearts with direct Taser applications. (Mot., Ex. Q at 21.) According to the training program, the pig study found no effect even when the pigs were "given stimulants such as Epinephrin & others similar to PCP and Cocaine, which make the heart rate more susceptible to electric stimulation." (Id.)
With respect to individuals on drugs, and specifically with respect to individuals under the influence of phencyclidine ("PCP"), the training program stated that "[i]f you have ever dealt with subjects on PCP you know that pain compliance DOES NOT WORK!" (Id. at 8-9.) The training included a video clip of the Taser being used on a person under the influence of PCP, although it is unclear from the record whether the Taser in that situation was in the probe or drive stun mode. (Id. at 8-9 & slides at 4.) The training program later stated, "Persons whom are highly focused, under the influence of drugs/alcohol or mentally disturbed are prone to what is called `mind-body disconnection.' If this is the case, then the M-26/X-26 becomes a pain compliance tool and has limited threat reduction potential." (Id. at 26.) The training program then states, "For those persons who are on the high end of the `mind/body disconnection,' the Taser will still work in the stun drive mode, however remember to aggressively drive the M-26/X-26 into the preferred target area for the best possible results." (Id.) LVMPD trained its officers to use the drive stun mode in three areas: the brachial or lower neck area, the lower abdomen, and the back of the calf. (Mot., Ex. E at 188-89; Ex. Q at 25.)
In terms of the appropriate use of the Taser, LVMPD trained its officers that the Taser should be employed only to stop a threat and should "never be used ... on subjects who have been placed in handcuffs." (Mot., Ex. Q at 26.) According to LVMPD policy, the Taser should not be used on handcuffed individuals absent compelling reasons to do so. (Mot., Ex. Q, Procedural Order PO-XX-03 at 1.) LVMPD policy directed officers not to use a Taser when a subject has come in contact with flammable liquids, when a subject may fall causing serious injury or death, to intimidate or provoke individuals, or to awaken unconscious or intoxicated individuals. (Mot., Ex. R.) LVMPD policy further directed officers should not use the Taser when the subject is operating a motor vehicle, when the subject is holding a firearm, when a handcuffed prisoner resists or refuses to enter a police vehicle or holding or booking area, on a visibly pregnant woman, or when the subject is extremely elderly or impaired. (Id.) LVMPD trained its officers they must warn the subject of the officer's intent to use the Taser. (Mot., Ex. Q at 26.) At the time, LVMPD trained its officers they may use the Taser as many times as it takes to obtain compliance. (Mot., Ex. E at 197-98, 217.)
In addition to the Taser training, LVMPD trained its officers on a use of force continuum that runs from the lowest level, which may include the officer's presence, to the highest level, the use of deadly force. (Id. at 193.) A level one use of force relates to the officer's presence and may include the officer standing, walking, or running. (Mot., Ex. S at 2.) A level two use of force relates to verbal commands and may include using the officer's normal tone of voice or shouting. (Id.) A level three use of force involves restraint and control, and may include the officer using an empty hand, pepper spray, impact tools, or handcuffs. (Id.) At the time of this incident, LVMPD considered the Taser a level three use of force, similar to the use of a baton or tear gas. (Mot., Ex. E at 193-94.) This level of force may be appropriate in situations where someone has become combative with the officers. (Id.)
William Lomax was a twenty-six year old man, five feet eight inches tall and weighing two hundred and thirty pounds. (Id. at 160.) Lomax used the illegal drug PCP on February 20, 2004. (Mot., Ex. D at 23.) At approximately 6:00 p.m. that day, two housing security officers at the Emerald Breeze Apartments, David Wireman ("Wireman") and Joseph Herrera ("Herrera"), observed Lomax at the apartment complex walking in circles and lifting up his shirt. (Mot., Ex. E at 60-62, 90.) Wireman and Herrera asked Lomax if he was feeling well, but Lomax was not responding to their questions. (Id. at 62, 91.) Wireman and Herrera called for backup from other apartment complex security guards. (Id. at 62, 90.) Housing security officers Brian Cornell ("Cornell") and James Hines ("Hines") arrived in response to the call for backup. (Id. at 71.) Cornell previously had subdued Lomax and had him transported off the property by ambulance when Lomax was high on PCP on another occasion. (Id. at 38-40, 83-84.) Cornell and Herrera recognized Lomax from previous incidents on the property. (Id. at 40, 83-87.)
According to the security officers, Lomax appeared "dazed or confused," appeared to be under the influence of some kind of drug or alcohol, and had a chemical odor about him. (Id. at 41-42.) Additionally, Lomax was sweating, clenching his fists, and was not responding to the officers' questions. (Id. at 41-42, 62, 71.) Hines asked Lomax whether he wanted medical attention, to which Lomax finally responded that he did. (Id. at 42, 71, 91.) Herrera called for medical assistance. (Id. at 42, 91.)
While the security officers were waiting for medical assistance to arrive, Defendant LVMPD police officer Rader drove by while he was on another call. (Id. at 43, 63, 91, 206-07.) Rader recognized Lomax from a previous encounter in which Lomax was high on PCP and was combative. (Id. at 207-08.) Rader informed the security officers he would be done with the other call quickly and would return when he was done. (Id. at 43, 63, 93.)
After Rader returned to the scene, Hines took Lomax's pulse and it was racing. (Id. at 63.) Lomax then grabbed Hines' arms and shirt. (Id. at 43-44, 63, 71.) Hines told Lomax to stop resisting and let go, but Lomax would not let go. (Id. at 44, 93.) Wireman grabbed Lomax and told him to relax and quit resisting. (Id. at 63-64, 71.) Hines, Wireman, and Cornell attempted to restrain Lomax and put handcuffs on him. (Id. at 44-45, 71-72.)
At this point, Rader approached the security officers and Lomax and repeatedly told Lomax to stop resisting or he would use a Taser. (Id. at 45-47, 64, 73, 93-94, 211-12.) When Lomax did not cease resisting, Rader told the security officers to hold Lomax because Rader was going to use the Taser and Rader did not want Lomax to fall and injure himself. (Id. at 47, 64, 73.) Rader then applied the Taser to Lomax in the neck area using the drive stun mode, Lomax began to fall, and the officers lowered him to the ground. (Id. at 47-48, 64, 73-74, 94, 211-12.) According to Rader's Taser log, the first Taser discharge lasted three seconds. (Mot., Ex. EE.)
When Lomax was on the ground, the security officers attempted to handcuff him, but Lomax started resisting again. (Mot., Ex. E at 48, 74, 94-95, 211-21.) Rader told Lomax to quit resisting or Rader would use the Taser on him again. (Id. at 48-49, 74, 211-12.) According to Rader's Taser log, Rader used the Taser on Lomax within thirteen seconds from the first application for a duration of four seconds. (Mot., Ex. EE.)
After this second Taser discharge, the security officers were able to handcuff Lomax. (Mot., Ex. E at 49, 74, 214.) Due to Lomax's size, the officers used two handcuffs linked together to handcuff Lomax to permit him to be more comfortably restrained. (Id. at 46-47, 64, 74, 95.) After being handcuffed, Lomax continued to struggle and began throwing kicks. (Id. at 49, 75.) Cornell held down Lomax's legs so he would not injure himself or the officers, while Wireman and Hines each held one of Lomax's elbows. (Id. at 49, 76.)
Shortly after the officers handcuffed Lomax, the fire department and ambulance service, American Medical Response ("AMR"), arrived. (Id. at 49-50, 75.) According to several medical personnel, one of the housing security officers had his knee in Lomax's back, which the medical personnel requested the officer remove to permit Lomax to breathe more freely. (Id. at 122, 131, 134, 147-48.) Lomax continued to be combative during this time and was unresponsive to medical personnel's questions. (Id. at 46-50, 116-19, 128, 131, 141-42, 147, 214-15.) The medical personnel wanted to transport Lomax to the hospital, and they requested the security officers' assistance in getting Lomax on a gurney. (Id. at 50, 75.) The security officers and Rader placed Lomax face down on the gurney as directed by medical personnel. (Id. at 51, 76, 215.)
After Lomax was on the gurney, medical personnel requested the security officers remove the handcuffs and place Lomax in the soft restraints on the, gurney. (Id. at 51, 76, 215.) Lomax continued to be combative while the housing security officers and medical personnel tried to put him in the soft restraints. (Id. at 51, 76, 130, 150-52, 215.) Rader repeatedly told Lomax to quit resisting and warned Lomax he would use the Taser on Lomax again if Lomax did not comply. (Id. at 77, 215.) Rader's Taser log shows the third Taser application came 7 minutes 42 seconds after the second application for a duration of two seconds. (Mot., Ex. EE.) The log shows Rader used the Taser on Lomax four more times within a two minute span with the discharges lasting for 6, 8, 2, and 6 seconds respectively. (Id.)
According to Rader, Lomax would be compliant while the Taser was discharging but would begin resisting within seconds afterwards. (Mot., Ex. E at 212-13, 215-16.) Rader also indicated that with each Taser application, the officers and/or medical personnel were able to secure Lomax's arms or legs. (Mot., Ex. G at 52.) They ultimately got Lomax restrained in the soft restraints on the gurney. (Mot., Ex. E at 77.)
At some point after the last Taser application, Lomax became docile; however, the witnesses are not in agreement as to when this happened. According to security officers Cornell and Hines, Lomax continued to resist and be combative until right before he was loaded into the ambulance. (Id. at 51, 76-77.) Rader likewise suggests Lomax was still moving around on the gurney after the last Taser application, although his movement was limited by the soft restraints. (Mot., Ex. G at 52-53.)
City of Las Vegas Fire and Rescue paramedic Robert Pearson ("Pearson") testified at the coroner's inquest that Lomax became unresponsive and stopped kicking before medical personnel moved him to the back of the ambulance. (Mot., Ex. E at 120.) However, in a deposition, Pearson testified Lomax was "grunting" and straining against the restraints as medical personnel moved him to the ambulance. (Mot., Ex. AA at 17, 27.) Pearson testified at his deposition that it was not until Lomax was loaded into the back of the ambulance that Lomax became "docile," and "stopped screaming and stopped moving." (Id. at 18-20.) Firefighter EMT Brandon Israel testified at his deposition that Lomax was "thrashing" as he was moved to the back of the ambulance, although Lomax was not struggling as much as before. (Mot., Ex. KK at 25, 28.)
AMR paramedic Jason Ritz testified Lomax continued to tense up and fight, grunting and moaning while medical personnel were assessing him in the back of the ambulance. (Mot., Ex. LL at 21-22; Ex. SS at 83; see also Mot., Ex. H at MED1-0009 (AMR report indicating Lomax "becomes very combative in amb.").) A fire engineer with Las Vegas Fire and Rescue, Keith Murray ("Murray"), testified Lomax went from being "irate" to "nothing" and that concerned him, so he checked whether Lomax was breathing, although it appears from Murray's testimony this occurred after Lomax was loaded into the ambulance. (Mot., Ex. E at 110.)
Fire Captain Lorin Spendlove ("Spendlove") stated Lomax went from being "combative to unresponsive in a matter of just seconds." (Id. at 130.) Spendlove testified Lomax "went from total combativeness to just unresponsive, and then I saw one tazing come in where the patient actually jerked and tensed up and then laid right back down to that unresponsive state." (Id. at 132.) According to Spendlove, Lomax was unresponsive before he went into the ambulance. (Id. at 130.) Spendlove stated that Lomax stopped virtually all resistance after the last Taser discharge, and Lomax did not say another word or move on the way to the ambulance. (Mot., Ex. II at 11, 13-14; Mot., Ex. HH at 15.) AMR field intermediate Kelly Hintsala testified Lomax was unresponsive before being loaded into the ambulance. (Mot., Ex. E at 144.)
All witnesses agree Lomax was breathing when medical personnel first loaded Lomax into the ambulance. (Mot., Ex. E at 52, 78, 108, 110, 152; Ex. AA at 18-20; Ex. HH at 16; Ex. SS at 85; Ex. TT at 5; Ex. at at 17.) A few minutes later the medical personnel requested assistance in flipping Lomax over onto his back. (Mot., Ex. E at 52, 78, 153.) According to Cornell, Lomax was not conscious at this point. (Id. at 52.) After they flipped Lomax onto his back, medical personnel determined Lomax was not breathing. (Id. at 52, 78, 108, 110; Ex. SS at 85.) Lomax was asystole, meaning he had no electric activity in the heart. (Mot., Ex. H at MED 1-0009.) Medical personnel began life saving procedures, and the ambulance immediately took Lomax to the hospital.[2] (Mot., Ex. E at 78, 108.) Lomax lived for another twenty hours before he died. (Id. at 173.)
Post-mortem blood testing showed Lomax had PCP and cannabinoids in his system when he died. (Mot., Exs. A & B.) The medical examiner forensic pathologist who performed the autopsy for the Clark County Coroner's Office, Dr. Ronald Knoblock ("Dr. Knoblock"), ruled Lomax's death a homicide. (Mot., Ex. E at 164; Ex. M.) Dr. Knoblock determined the cause of death was cardiac arrest during restraining procedures, with PCP intoxication and bronchial pneumonia as significant contributing conditions. (Mot., Ex. E at 164.)
A coroner's inquest was held to inquire into Lomax's death. (Mot., Ex. E.) Dr. Knoblock testified at the inquest that PCP ingestion causes "great physiological stress" to the body, including high blood pressure and hyperthermia. (Id. at 163.) According to Dr. Knoblock, the struggle, the PCP, and the position in which Lomax was placed decreased his ability to breathe. (Id. at 165-67.) Dr. Knoblock concluded the Taser contributed to Lomax's death because it added to this combination of factors by "contract[ing] the skeletal muscles ... the only ability to breathe would be the skeletal muscles of the ribs to expand your lungs, so for a period of time, multiple times, if you contract those muscles, he is not going to be able to breathe at all, most likely, and I believe that through this entire experience he finally was depleted and went into cardiac arrest." (Id. at 167.) However, Dr. Knoblock stated he could not conclude that Lomax would have lived if Rader had not used the Taser on Lomax. (Id. at 167-68.) Additionally, at his deposition, Dr. Knoblock testified that he has no scientific or medical evidence that a Taser can kill an adult person. (Mot., Ex. N at 87.)
The inquest jury found Lomax died as a result of a combination of drugs, restraining force, and the use of the Taser, and the persons causing Lomax's death were Lomax, whichever security officer applied the knee to Lomax's back, and Rader. (Mot., Ex. E at 229.) The jury found the death excusable. (Id. at 229.)
Plaintiffs brought suit in Nevada state court on November 23, 2005. (Notice of Removal [Doc. # 1], Compl.) Defendants LVMPD and Rader removed the action to this Court on December 9, 2005. (Notice of Removal.) Plaintiffs filed a Second Amended Complaint (Doc. # 125) on February 14, 2007. Plaintiffs assert against Defendants LVMPD and Rader civil rights violations under 42 U.S.C. § 1983 (count one), civil rights violations under 42 U.S.C. § 1983 based on familial relationships (count two), municipal liability under 42 U.S.C. § 1983 (count three), negligent supervision and training (count four), and wrongful death (count five).
Defendants LVMPD and Rader now move for summary judgment on all claims. Defendants argue Rader did not use excessive force, and even if he did, he is entitled to qualified immunity. Defendants also argue LVMPD's training program was adequate. Defendants therefore argue no genuine issue of material fact remains that Defendants did not violate Plaintiffs' constitutional rights. Defendants also argue they are entitled to discretionary immunity under Nevada state law, and, in any event, are not liable for any state law torts because Rader acted appropriately and LVMPD's training program is adequate.
Plaintiffs respond that Rader acted contrary to his training and LVMPD policy, and used excessive force in using the Taser on Lomax while Lomax was lying on the gurney. Plaintiffs argue Rader is not entitled to qualified immunity because he knew based on his training he should not have used the Taser as he did. Plaintiffs contend LVMPD's training policy is inadequate because LVMPD recognized the need to take perpetrator medical conditions into account, but LVMPD did not train its officers about the potential risk a Taser poses to vulnerable individuals like Lomax. Plaintiffs argue Defendants are not entitled to discretionary immunity under state law, and that genuine issues of material fact remain that Defendants committed state law torts.

II. LEGAL STANDARD
Summary judgment is appropriate if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The substantive law defines which facts are material. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). All justifiable inferences must be viewed in the light most favorable to the non-moving party. County of Tuolumne v. Sonora Cmty. Hosp., 236 F.3d 1148, 1154 (9th Cir.2001).
The party moving for summary judgment bears the initial burden of showing the absence of a genuine issue of material fact. Fairbank v. Wunderman Cato Johnson, 212 F.3d 528, 531 (9th Cir.2000). The burden then shifts to the non-moving party to go beyond the pleadings and set forth specific facts demonstrating there is a genuine issue for trial. Id.; Far Out Prods., Inc. v. Oskar, 247 F.3d 986, 997 (9th Cir. 2001). The party opposing summary judgment "must cite to the record in support of the allegations made in the pleadings to demonstrate that a genuine controversy requiring adjudication by a trier of fact exists." Taybron v. City & County of San Francisco, 341 F.3d 957, 960 (9th Cir. 2003). A district court is not required to comb the record looking for genuine issues of material fact that a party does not bring to the court's attention. Carmen v. S.F. Unified Sch. Dist., 237 F.3d 1026, 1028-31 (9th Cir.2001).

III. OBJECTION TO EVIDENCE
Plaintiffs attach to their opposition two exhibits. The first is the Joint Non-Lethal Weapons Human Effects Center of Excellence Technical Report on "Human Effectiveness and Risk Characterization of the Electromuscular Incapacitation DeviceA Limited Analysis of the TASER," dated March 2005. (Pls.' Opp'n [Doc. # 311], Ex. A.) The second is the American Civil Liberties Union of Northern California's ("ACLU") Taser study, "Stun Gun Fallacy: How the Lack of Taser Regulation Endangers Lives," dated September 2005. (Id., Ex. B.) The reports discuss possible dangers associated with Taser use, including the Taser's ability to cause respiratory problems and acidotic responses. The ACLU report also discusses defects in training policies and criticizes the marketing plans of the company that markets the Taser, Defendant Taser International, Inc.
Defendants LVMPD and Rader object that the two exhibits are unauthenticated and hearsay. Moreover, Defendants argue both reports post-date the Lomax incident and thus are of limited value in determining what was known to Rader and LVMPD at the time of the incident with Lomax.
Documents which are not properly authenticated cannot support an opposition to a summary judgment motion. See Orr v. Bank of Am., NT & SA, 285 F.3d 764, 773 (9th Cir.2002). "Authentication is a condition precedent to admissibility, and this condition is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Id. (citing Fed.R.Evid. 901(a)) (quotation and footnote omitted). The proponent of evidence must make a prima facie showing of authenticity such that a reasonable juror could find in favor of authenticity. United States v. Chu Kong Yin, 935 F.2d 990, 996 (9th Cir.1991).
Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed.R.Evid. 801(c). Hearsay is not admissible absent an applicable exception. Fed.R.Evid. 802. Hearsay included within hearsay is inadmissible unless each link in the hearsay chain falls within a hearsay exception. Padilla v. Terhune, 309 F.3d 614, 621 (9th Cir.2002). The decision to exclude evidence lies within the district court's discretion. Orr, 285 F.3d at 776.
The Court, in its discretion, will exclude Plaintiffs' Exhibits A and B. Plaintiffs have not authenticated either report. Moreover, each report is itself hearsay and contains hearsay within hearsay. To the extent Plaintiffs offer the reports for the truth of the matters asserted therein, that Tasers represent health risks to certain individuals, Plaintiffs have not presented any argument that the reports or the hearsay within the reports fall within a hearsay exception.
Plaintiffs also have not suggested a nonhearsay use for the reports. To the extent Plaintiffs could offer the reports for the nonhearsay purpose that Defendants should have been on some sort of inquiry notice that Tasers might be dangerous to vulnerable individuals, the reports, and the Taser incidents that the ACLU report discusses, post-date the Lomax incident. The Technical Report is dated March 2005. The ACLU study is dated September 2005, and the earliest incident it discusses in depth occurred in September 2004. The Lomax incident occurred in February 2004. Consequently, the reports are not admissible because they are unauthenticated, hearsay, and Plaintiffs have not established a nonhearsay use for the reports. The Court therefore will not consider the reports in ruling on summary judgment.

IV. CLAIMS UNDER 42 U.S.C. § 1983
Title 42 U.S.C. § 1983 provides that "[e]very person who, under color of [law], subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law ... or other proper proceeding for redress." Consequently, to establish liability under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law. Broam v. Bogan, 320 F.3d 1023, 1028 (9th Cir.2003).

A. Count One: Excessive Force Under the Fourth Amendment
In count one of the Second Amended Complaint, Plaintiffs[3] assert Defendant Rader violated Lomax's Fourth Amendment rights by using excessive force.[4] Defendant Rader moves for summary judgment, arguing that under the circumstances, he did not use excessive force to control a violent and resisting person who needed immediate medical care. Rader notes no one has testified he used the Taser on Lomax at any time when Lomax was not resisting and Plaintiffs' own expert testified the first two Taser applications were appropriate. Rader also argues Plaintiffs' expert agreed Rader could have believed the last Taser uses temporarily would allow Rader and the security officers to get Lomax strapped to the gurney and taken to the ambulance.
Plaintiffs respond that although the first two Taser applications may have been reasonable to get Lomax restrained, the last five applications were objectively unreasonable. Plaintiffs argue Lomax already was restrained and using a weapon in those circumstances was both prohibited by LVMPD's policy and training, and was ineffective. Plaintiffs argue an obese individual lying face down on a medical gurney while handcuffed was not a threat justifying the use of the Taser. Plaintiffs also argue Rader had been trained not to use the Taser on an individual in handcuffs and Rader should have known that using his Taser to get Lomax into the soft restraints was not a compelling justification for its use on someone in handcuffs.
Plaintiffs further argue Rader was trained that the Taser may affect high risk persons. Rader knew Lomax was obese and suspected he was high on PCP. Plaintiffs thus argue Rader should have known Lomax was susceptible to an adverse medical response to the Taser. Moreover, Rader had been trained that the drive stun mode was ineffective as a pain compliance tool on persons under the influence of PCP, yet he used the drive stun mode on Lomax repeatedly. Plaintiffs contend the only thing this achieved was wearing down Lomax's body to the point of death.
Courts analyze claims that law enforcement officers have used excessive force in the course of an arrest under the Fourth Amendment to the United States Constitution. Smith v. City of Hemet, 394 F.3d 689, 700 (9th Cir.2005) (citing Graham v. Connor, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989); Ward v. City of San Jose, 967 F.2d 280 (9th Cir. 1992) (as amended)). In determining the reasonableness of a non-deadly force seizure, the Court must balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing government interests at stake." Miller v. Clark County, 340 F.3d 959, 964 (9th Cir.2003) (quotations omitted). This entails a three-step analysis. Id. First, the Court must assess "the gravity of the particular intrusion on Fourth Amendment interests by evaluating the type and amount of force inflicted." Id. Second, the Court must assess "the importance of the government interests at stake by evaluating: (1) the severity of the crime at issue, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight." Id. The Court may consider other factors, including "the availability of alternative methods of capturing or subduing a suspect." Smith, 394 F.3d at 701.
Third, the Court weighs the gravity of the intrusion against the government's interest to determine whether the amount of force was constitutionally reasonable. Miller, 340 F.3d at 964. The reasonableness inquiry looks at all the relevant objective facts and circumstances that confronted the arresting officers in each particular case, "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Drummond ex rel. Drummond v. City of Anaheim, 343 F.3d 1052, 1058 (9th Cir.2003) (quotation omitted); Smith, 394 F.3d at 701. Additionally, the reasonableness analysis must consider the fact that "police officers are often forced to make split-second judgmentsin circumstances that are tense, uncertain, and rapidly evolvingabout the amount of force that is necessary in a particular situation." Drummond, 343 F.3d at 1058 (quotation omitted). Although a police department's policies or training materials are not dispositive on the constitutional level of reasonable force, courts may consider a police department's own guidelines when evaluating whether a particular use of force is constitutionally unreasonable. Id. at 1059.
Because the reasonableness balancing test "nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom," courts should grant summary judgment in excessive force cases "sparingly." Id. at 1056. "This is because police misconduct cases almost always turn on a jury's credibility determinations." Id. However, a court may decide reasonableness as a matter of law if, "in resolving all factual disputes in favor of the plaintiff, the officer's force was objectively reasonable under the circumstances." Jackson v. City of Bremerton, 268 F.3d 646, 651 n. 1 (9th Cir.2001) (internal quotation omitted).
Rader is entitled to summary judgment that no Fourth Amendment violation occurred with respect to the first Taser discharge. Rader had probable cause to believe Lomax was trespassing and was under the influence of an illegal substance. Further, Lomax had grabbed Hines and was actively resisting the security officers. Rader repeatedly warned Lomax to cease resisting or Rader would use the Taser on him. Despite repeated warnings by Rader and the commands of the security officers, Lomax refused to comply. Rader therefore was justified in using force against Lomax.
Rader ensured the housing security officers had a grip on Lomax so Lomax would not be injured by falling after the Taser application. Lomax was effected by the Taser, as demonstrated by him falling and the security officers easing him to the ground. Rader applied the Taser to Lomax's neck area for three seconds, less than a full five second discharge. Consequently, Rader had both a justification for using the Taser, and he used it in a safe and effective manner with respect to the first Taser application. Plaintiffs' own expert, Ronald Martinelli ("Martinelli"), agrees that the first Taser discharge was a reasonable use of force. (Mot., Ex. NN at 219.)
Rader also is entitled to summary judgment that the second Taser application was a reasonable use of force. Lomax began struggling again within seconds after the first Taser discharge as the housing security officers attempted to put Lomax into handcuffs. Rader again repeatedly warned Lomax to cease resisting or he would use the Taser on Lomax. Lomax again failed to comply. Rader applied the Taser to Lomax's neck in the drive stun mode to which Lomax responded by ceasing to resist for enough time to enable the housing security officers to secure Lomax in handcuffs. Martinelli again agrees the second Taser use was both effective and appropriate due to Lomax's assault on Hines and his continuing resistance despite repeated commands and warnings. (Id.)
Plaintiffs agree the first two Taser applications were justified and reasonable uses of force. However, Plaintiffs argue the last five Taser applications were excessive. With respect to the last five Taser applications, Rader used substantial force in the form of five Taser applications, one as long as eight seconds, and all five in short succession. Placing this force on the use of force continuum then in effect, Rader utilized force equivalent to baton strikes and pepper spray. In considering the governmental interests at stake, the severity of the crime at issue was relatively low. Although Rader had probable cause to arrest Lomax for trespassing, illegal drug use, and possibly assault on the security officers, Rader did not indicate his intent in using the Taser on Lomax was to arrest him for any crime. Rather, he was attempting to assist the housing security officers in subduing Lomax for the purpose of getting Lomax medical care.
However, Rader had a substantial governmental interest in the threat Lomax posed to Lomax's own safety and the safety of the housing security officers, Rader, and other members of the public. Lomax was under the influence of PCP and needed medical attention. Additionally, Lomax had grabbed housing security officer Hines, and continued to struggle against the housing security officers by rolling around on the ground and throwing kicks even after he was handcuffed. No witness testified Rader used the Taser on Lomax at a time when Lomax was not resisting the housing security officers, disobeying Rader's verbal commands, or struggling against medical personnel.
Although Rader potentially had other means available to him to subdue Lomax, the testimony of all involved shows Lomax responded to each Taser use by momentarily ceasing to resist, which allowed the housing security officers and medical personnel to further restrain Lomax on the gurney. Consequently, a reasonable officer in Rader's circumstances could have believed resort to other means of force was unnecessary because the drive stun mode was having the desired effect. Other methods of force that Rader and the security officers attempted, such as verbal commands and the security officers each attempting to restrain a limb, were having little to no effect in gaining Lomax's compliance. Use of the Taser in probe mode or use of a baton or pepper spray risked injury to Rader or the housing security officers and medical personnel who were attempting to restrain Lomax.
Weighing the gravity of the intrusion against the government's interest, no genuine issue of material fact remains that Rader used a constitutionally reasonable amount of force. Rader was justified in using physical force to subdue Lomax because Lomax continued to physically fight the housing security officers even after he was handcuffed, while he was on the gurney, and while housing security officers and medical personnel attempted to place him in the soft restraints on the gurney.[5]
Although LVMPD had trained Rader that the drive stun mode may be ineffective against individuals under PCP who are experiencing a high level of mind/body disconnect, that same training suggested drive stun mode could be effective if driven aggressively into the subject. Rader effectively had used the Taser in the drive stun mode on Lomax twice, achieving the desired result of momentary compliance. Nothing about Lomax's reactions suggested further Taser use would not achieve similar moments of compliance to assist the medical personnel and security officers in restraining Lomax on the gurney. The testimony is consistent that in fact Rader obtained momentary compliance with each Taser use, and the security officers and medical personnel were able to make progress in securing Lomax in the soft restraints due to these moments of Taserinduced compliance.
No witness testified Rader used the Taser on Lomax when Lomax was not resisting. Plaintiffs present no evidence Rader knew or should have known repeated Taser applications in a short period of time would jeopardize Lomax's health. On the contrary, Rader had been trained he could use the Taser as many times as it took to obtain compliance. Because no genuine issue of material fact remains that Rader used reasonable force, the Court will grant Defendants' motion for summary judgment on count one.
Even if Rader's use of force was constitutionally unreasonable, Rader is entitled to qualified immunity. To allay the "risk that fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties," government officials performing discretionary functions may be entitled to qualified immunity for claims made under § 1983. Anderson v. Creighton, 483 U.S. 635, 638, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986). In ruling on a qualified immunity defense, a court first must consider whether the facts alleged show the defendant's conduct violated a constitutional right. Sorrels v. McKee, 290 F.3d 965, 969 (9th Cir.2002). In making this determination, the Court views the facts alleged in the light most favorable to the party asserting the injury. Id. If the plaintiff has alleged a deprivation of a constitutional right, the court then must determine whether that right was clearly established. Id.
A right is clearly established if "`it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" Wilkins v. City of Oakland, 350 F.3d 949, 954 (9th Cir.2003) (emphasis omitted) (quoting Saucier v. Katz, 533 U.S. 194, 202, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)). The court should make this second inquiry "in light of the specific context of the case, not as a broad general proposition." Saucier, 533 U.S. at 200, 121 S.Ct. 2151. An officer will be entitled to qualified immunity even if he was mistaken in his belief that his conduct was lawful, so long as that belief was reasonable. Wilkins, 350 F.3d at 955. The plaintiff bears the burden of showing that the right at issue was clearly established. Sorrels, 290 F.3d at 969. But, a plaintiff need not establish a court previously had declared the defendant's behavior unconstitutional if it would be clear from prior precedent that the conduct was unlawful. Blueford v. Prunty, 108 F.3d 251, 254 (9th Cir.1997).
Even if a genuine issue of fact remained that Rader violated Lomax's rights by using the Taser on Lomax five times in quick succession while Lomax was on the gurney, Rader's belief that he used an appropriate amount of force was reasonable. Rader was faced with a resisting individual who would not obey commands, who was struggling against all forms of restraint, and who needed prompt medical care. His use of the Taser was effective in gaining momentary compliance and assisting the housing security officers and medical personnel in making progress in restraining Lomax. Efforts at using lesser means of force, such as verbal commands and physical restraining of his limbs by the security officers, were insufficient to gain control over Lomax to permit medical personnel to assist him. Plaintiffs point to no clearly established law that multiple Taser applications in short succession on a struggling suspect constitute excessive force such that a reasonable officer in Rader's position would know Rader's conduct was unlawful.
Although Plaintiffs point to Rader's alleged failure to conform to departmental policy and his training, Rader's conduct was not directly contrary to his training and LVMPD policy such that a reasonable officer would know his conduct was not only contrary to policy and training, but also unconstitutional. First, although the training mentions PCP intoxicated individuals are pain tolerant and therefore the drive stun mode is less effective, it does not rule out the use of the drive stun mode on a PCP intoxicated individual, instead suggesting the officer aggressively drive the Taser into the subject. Based on Lomax's responses to the Taser in becoming momentarily compliant with each use, Rader's belief that Lomax was responding to the Taser in the drive stun mode was reasonable.
Second, LVMPD policy does not ban the use of the Taser on a handcuffed individual. Pursuant to LVMPD policy, an officer may use the Taser on an individual in handcuffs if compelling reasons exist. Rader's belief such compelling circumstances existed here was reasonable where Lomax struggled throughout the incident, ignored repeated verbal commands, resisted other forms of restraint, and needed to be brought under control so he could receive prompt medical attention.
Finally, Plaintiffs argue the testimony of their police practices expert, Martinelli, raises an issue of fact regarding the propriety of Rader's conduct. Plaintiffs note Martinelli opined that Rader could and should have exhausted other options, such as calling for backup, "attempting to stall by communicating with Lomax," or utilizing the Taser in the probe mode and then directing the security officers to restrain Lomax following the probe mode discharge. (Pls.' Opp'n at 22.)
Martinelli's opinion does not raise a genuine issue of material fact. First, Rader employed some of these suggested techniques. Rader called for backup. (Mot., Ex. E at 219, 221.) Rader, the security officers, and medical personnel all attempted to communicate with Lomax without success. Further, two of the security officers and medical personnel attempted to hold down Lomax's limbs to assist in getting Lomax moved to the soft restraints. Finally, using the probe mode while Lomax was strapped to the gurney risked injuring those attempting to restrain Lomax. Moreover, the test is not whether an officer attempted all other available methods of responding to a situation, but whether an officer reasonably could believe his conduct was lawful under the circumstances confronting him. That Rader possibly had other options available to him does not mean his use of the Taser in drive stun mode was excessive or that he could not reasonably believe that using the Taser was an appropriate use of force. The Court therefore will grant Defendants' motion for summary judgment on count one.

B. Count Three: Municipal Liability
Count three of Plaintiffs' Second Amended Complaint alleges Defendant LVMPD is liable for Lomax's death due to its policy of inadequately training its officers on the use of the Taser. LVMPD moves for summary judgment on this claim, arguing no evidence in the record establishes that a reasonable police department should have known, at the time of this incident, that the Taser would result in death. LVMPD notes its policies have received endorsement from a national accreditation agency, and Plaintiffs' police practices expert, Martinelli, did not criticize LVMPD's training of Rader. Additionally, Defendants have presented their own experts who approved of LVMPD's policies.
Plaintiffs respond LVMPD has a policy of training its officers that an officer could use the Taser as many times as it takes to obtain compliance, that the Taser is medically safe and non-lethal, and will not affect involuntary muscles or affect cardiac pumping. Plaintiffs contend this policy was the moving force behind Rader's actions, as he used the Taser on Lomax repeatedly in close succession.
Plaintiffs further contend LVMPD failed to train its employees on the dangers of Taser use on vulnerable individuals beyond pregnant women and the elderly. Plaintiffs note that prior to permitting its officers to carry Tasers, LVMPD conducted a study in 2003 that indicated perpetrator medical considerations should be considered in developing a policy on Taser use. Plaintiffs contend that despite recognizing the risk, LVMPD did not include such information in its policy and training on Tasers. Plaintiffs note Defendants argue Lomax was so high risk he could have died absent any Taser applications, yet LVMPD does not train its officers how to deal with high risk subjects such as the obese or individuals on PCP. Plaintiffs argue this failure to train is deliberately indifferent to the rights of high risk citizens. Finally, Plaintiffs argue this failure in training is closely related to Lomax's death because Lomax became unresponsive and went into cardiac arrest shortly after the last Taser use.
"Municipalities, their agencies, and their supervisory personnel cannot be held liable under section 1983 on a theory of respondeat superior." Shaw v. State of Cal. Dep't of Alcoholic Beverage Control, 788 F.2d 600, 610 (9th Cir.1986). But these entities may be held liable for "deprivations of constitutional rights resulting from their policies or customs." Id. Thus, a plaintiff suing a municipality or its agency must establish both a constitutional deprivation and the existence of a municipal custom or policy that caused the deprivation. Munger v. City of Glasgow Police Dep't, 227 F.3d 1082, 1087 (9th Cir.2000) (citing Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690-91, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)); Wallis v. Spencer, 202 F.3d 1126, 1136 (9th Cir.2000).
A "policy" is "a deliberate choice to follow a course of action ... made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." Fairley v. Luman, 281 F.3d 913, 918 (9th Cir.2002) (quotation omitted). "A `policy' can be one of action or inaction." Id. (internal citations omitted). A jury may infer the municipality deliberately chose inaction where the municipal policymaker "disregarded a known or obvious consequence of his action." Gibson v. County of Washoe, Nev., 290 F.3d 1175, 1194-95 (9th Cir.2002) (quotation omitted).
"A municipality's failure to train an employee who has caused a constitutional violation can be the basis for § 1983 liability where the failure to train amounts to deliberate indifference to the rights of persons with whom the employee comes into contact." Long v. County of Los Angeles, 442 F.3d 1178, 1186 (9th Cir.2006). A plaintiff making such a claim must show the training program is inadequate and the inadequate training represents municipal policy. Id. In other words, municipal policymakers' "continued adherence ... to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action-the deliberate indifferencenecessary to trigger municipal liability." Id. (quotation omitted). However, evidence the municipality failed to train one officer is insufficient to establish a municipality's deliberate policy. Blankenhorn v. City of Orange, 485 F.3d 463, 484-85 (9th Cir.2007). Rather, the inadequate training must be widespread. Id.
A plaintiff may prove a municipal policy was the moving force behind a constitutional violation in three ways: (1) the municipality adopted an express policy; (2) a municipal employee commits a constitutional violation pursuant to the municipality's longstanding practice or custom; or (3) the person causing the violation has final policymaking authority. Webb v. Sloan, 330 F.3d 1158, 1164 (9th Cir.2003). A pattern of tortious conduct by inadequately trained employees may show inadequate training is the moving force behind a plaintiff's injury. Long, 442 F.3d at 1186-87. Alternatively, a plaintiff may establish failure-to-train even without showing a pattern where a "violation of federal rights may be a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations." Id. (quotation omitted).
Because the Court has concluded no genuine issue of material fact remains that Rader used reasonable force, Plaintiffs cannot establish LVMPD is liable for a constitutional violation from its alleged failure to train Rader. Further, Plaintiffs fail to present evidence raising a genuine issue of material fact that LVMPD's policies and training as they existed in February 2004 were deficient. Although Plaintiffs contend LVMPD should have trained its officers regarding Taser use on vulnerable individuals, LVMPD did so. LVMPD policy directed that its officers may not use a Taser when the subject has come in contact with flammable liquids, when the subject may fall causing serious injury or death, to intimidate or provoke individuals, or to awaken unconscious or intoxicated individuals. LVMPD policy directed officers should not use the Taser when the subject is operating a motor vehicle, when the subject is holding a firearm, when a handcuffed prisoner resists or refuses to enter a police vehicle or holding or booking area, on a visibly pregnant woman, or when the subject is extremely elderly or impaired.
Plaintiffs have provided no evidence LVMPD had some reason to suspect at the time that it trained Rader in December 2003, or at the time of the incident in February 2004, that its officers could not safely use a Taser on a subject as many times as necessary or that repeated Taser use on a "vulnerable" individual could cause death. Consequently, Plaintiffs have failed to raise a genuine issue of material fact that LVMPD's training and policies placed citizens at risk sufficient to show LVMPD was deliberately indifferent to citizens' rights by failing to train on those issues. Plaintiffs do not offer any studies or training bulletins preceding the Lomax incident that would have put LVMPD on notice that deaths had resulted from or coincided with repeated Taser use on "vulnerable" people such as Lomax.[6]
Defendants present opinions from two police practices experts, Chris Lawrence and D.S. Cameron, that LVMPD's policies were consistent with prevailing standards at the time and were adequate.[7] (Mot., Ex. T at 31-38; Ex. U.) Plaintiffs present no contrary evidence. The Court therefore will grant Defendants' motion for summary judgment on count three.

C. Count Two: Familial Relationships
Count two of Plaintiffs' Second Amended Complaint alleges Defendants violated Plaintiffs' Fourteenth Amendment rights by depriving Plaintiffs of their liberty interest arising out of their familial relationship with Lomax. Defendants move for summary judgment on this claim, arguing that because no Fourth Amendment violation exists, Plaintiffs cannot state a claim for a Fourteenth Amendment violation for interference with family relationships. Plaintiffs respond that because a genuine issue of material fact remains regarding the Fourth Amendment violation, the Fourteenth Amendment family relationship claim survives.
The parents and children of a person killed by law enforcement officers may assert a substantive due process claim under the Fourteenth Amendment based on the deprivation of their liberty interest arising out of their relationship with the decedent. See Moreland v. Las Vegas Metro. Police Dep't, 159 F.3d 365, 371 (9th Cir.1998). The plaintiff must allege more than mere negligence to support a due process claim, however. Toguchi v. Chung, 391 F.3d 1051, 1060 (9th Cir.2004). If the officer's actions were objectively reasonable, "it follows that his conduct d[oes] not offend the more stringent standard applicable to substantive due process claims." Moreland, 159 F.3d at 371 n. 4.
Because no genuine issue of material fact remains that Defendants did not violate Lomax's Fourth Amendment rights, no genuine issue of material fact remains that Defendants did not violate Plaintiffs' Fourteenth Amendment rights to familial relationships with Lomax. The Court therefore will grant Defendants' motion for summary judgment on count two.

V. CLAIMS UNDER NEVADA STATE LAW

A. Count Four: Negligent Supervision and Training
Count four of Plaintiffs' Second Amended Complaint alleges Defendant LVMPD negligently supervised and trained Rader. Defendants move for summary judgment, arguing LVMPD is entitled to discretionary immunity under Nevada state law for the training and supervision of its employees. Additionally, Defendants argue no evidence in the case raises a genuine issue of material fact that there is a systemic inadequacy in LVMPD's training. LVMPD also notes Rader had never been involved in any internal investigations or had any complaints lodged against him prior to this incident.
Plaintiffs respond that supervision and training is not a claim to which discretionary immunity applies. Plaintiffs further argue LVMPD recognized the fact that a subject's medical condition would be an important consideration in training on Taser use, yet LVMPD did not train its officers to avoid that risk. Instead, LVMPD told its officers the Taser was safe and did not warn about dangers to atrisk individuals other than pregnant women and the elderly.
Nevada Revised Statute § 41.032 sets forth exceptions to Nevada's general waiver of sovereign immunity. Pursuant to § 41.032(2), no action may be brought against a state officer or employee or any state agency or political subdivision that is "[b]ased upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of the state or any of its agencies or political subdivisions or of any officer, employee or immune contractor of any of these, whether or not the discretion involved is abused."
To determine whether immunity for a discretionary act applies, Nevada utilizes a two-part test. First, an act is entitled to discretionary immunity if the decision involved an element of individual judgment or choice. Martinez v. Maruszczak, ___ Nev. ___, 168 P.3d 720, 729 (Nev.2007).[8] Second, the judgment must be "of the kind that the discretionary function exception was designed to shield," which includes actions "based on considerations of social, economic, or political policy." Id. at 727-29 (quotations omitted). The discretionary act exception was designed "to prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." Id. at 729 (quotation omitted). "Thus, if the injury-producing conduct is an integral part of governmental policymaking or planning, if the imposition of liability might jeopardize the quality of the governmental process, or if the legislative or executive branch's power or responsibility would be usurped, immunity will likely attach under the second criterion." Id. Discretionary act immunity may protect decisions at all levels of government so long as the decisions "require analysis of government policy concerns." Id. at 729.
For example, a state actor's decision to parole an inmate and the formulation of "overarching prison policies for inmate release are policy decisions that require analysis of multiple social, economic, efficiency, and planning concerns," which are entitled to discretionary immunity. Butler ex rel. Biller v. Bayer, ___ Nev. ___, 168 P.3d 1055, 1067 (Nev.2007). In contrast, a state actor's conduct in placing a severely disabled parolee in the care of an individual whose home lacked needed accommodations required the exercise of judgment or choice, but this decision was not based on the consideration of any social, economic, or political policy. Id. Accordingly, the state actor's decision to leave the disabled inmate at his girlfriend's residence "despite the obvious lack of preparation" was not entitled to discretionary act immunity. Id.
Nevada looks to federal decisional law on the Federal Tort Claims Act for guidance on what type of conduct discretionary immunity protects. Martinez, 168 P.3d at 727-28. The United States Court of Appeals for the Ninth Circuit and other circuits have held that "decisions relating to the hiring, training, and supervision of employees usually involve policy judgments of the type Congress intended the discretionary function exception to shield." Vickers v. United States, 228 F.3d 944, 950 (9th Cir.2000) (citing cases).
Because Nevada looks to federal case law to determine the scope of discretionary immunity, and because federal case law consistently holds training and supervision are acts entitled to such immunity, LVMPD is entitled to discretionary immunity on this claim. Even if LVMPD were not entitled to discretionary immunity, no evidence suggests LVMPD negligently hired or supervised Rader. It is undisputed Rader had a complaint-free record prior to this incident. Further, as discussed above, Plaintiffs present no evidence LVMPD should have been aware Tasers posed a health risk to individuals in Lomax's condition. LVMPD presents evidence its policies were in line with prevailing standards at the time and Plaintiffs present no contrary evidence. The Court therefore will grant Defendants' motion for summary judgment on count four.

B. Count Five: Wrongful Death
Count five of Plaintiffs' Second Amended Complaint alleges Defendants caused Lomax's wrongful death. Defendants move for summary judgment on this claim, arguing Plaintiffs cannot establish Defendants caused Lomax's death because Lomax may have died due to his PCP intoxication and other medical issues even without Rader's use of the Taser. Additionally, Rader argues Lomax caused his own death by resisting the officers. Plaintiffs respond that Rader's conduct was wrongful and negligent because Rader created the situation leading to the need for additional Taser applications on the gurney by removing the handcuffs.
Under Nevada law, a decedent's heirs and personal representatives may bring a claim against any person who caused the death by "wrongful act or neglect." Nev. Rev.Stat. § 41.085; see also Doud v. Las Vegas Hilton Corp., 109 Nev. 1096, 864 P.2d 796, 798 (1993) (listing elements for negligence as: "(1) the defendant owed a duty of care to the plaintiff; (2) the defendant breached that duty; (3) the breach was the legal cause of the plaintiffs injury; and (4) the plaintiff suffered damages"). The Court already has ruled no genuine issue of material fact remains that Rader used reasonable force. Consequently, no genuine issue of material fact remains that Rader's actions were not wrongful and Rader did not breach a duty owed to Lomax. The Court therefore will grant Defendants' motion for summary judgment on count five.

VI. CONCLUSION
IT IS THEREFORE ORDERED that Defendants Las Vegas Metropolitan Police Department ("LVMPD") and Officer Reggie Rader's ("Rader") Motion for Summary Judgment (Doc. # 246) is hereby GRANTED.
IT IS FURTHER ORDERED that LVMPD's Daubert Motion to Exclude Testimony of Ron Martinelli From the Litigation (Doc. # 252) is hereby DENIED as moot.
IT IS FURTHER ORDERED that LVMPD's Daubert Motion to Exclude Testimony of David Ingebretsen From the Litigation (Doc. # 245) is hereby DNIED as moot.
IT IS FURTHER ORDERED that LVMPD's Daubert Motion to Exclude Testimony of Terence Clauretie From the Litigation (Doc. # 244) is hereby DENIED as moot.
NOTES
[1] Officer Rader was trained on the Taser and certified to use one. (Mot., Ex. E at 210-11, 221; Ex. G at 26-27.)
[2] AMR records show AMR was on the scene for twenty-two minutes. (Mot., Ex. H.)
[3] Only Plaintiff Joyce Charleston, as Special Administrator of Lomax's estate, may bring this claim on Lomax's behalf. See Moreland v. Las Vegas Metro. Police Dep't, 159 F.3d 365, 369 (9th Cir.1998) ("Fourth Amendment rights are personal rights which ... may not be vicariously asserted." (quotation omitted)).
[4] Plaintiffs also asserted Rader violated Lomax's Fourteenth Amendment rights. The Court already has ruled the Fourth Amendment controls in this situation. (Order [Doc. # 86] at 7-8; see also Graham v. Connor, 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989).)
[5] Although Plaintiffs suggest the handcuffs should not have been removed because Lomax effectively was restrained at that point, medical personnel requested the handcuffs be removed because they would not transport Lomax in the ambulance while he remained in the handcuffs. (Mot., Ex. E at 51, 76, 129-30.)
[6] Even if the Court considered the two reports Plaintiffs attach to their Opposition, the reports post-date the Lomax incident and thus would not have put LVMPD on notice of possible Taser related deaths.
[7] Plaintiffs move to exclude portions of Chris Lawrence's report related to his opinions on PCP, excited delirium, effects of the Taser on the human body, the "CSI" effect, positional asphyxia, and medical risk factors for sudden death. (Pls.' Daubert Mot. to Exclude the Test. of Defs.' Expert Witnesses [Doc. # 260].) However, Plaintiffs do not object to Chris Lawrence's opinions regarding LVMPD's training program. Plaintiffs also make no objection to D.S. Cameron's opinions.
[8] Nevada law previously involved an evaluation of whether the challenged conduct was discretionary in nature as opposed to "operational" or "ministerial" in nature. Martinez, 168 P.3d at 726-27. In Martinez, the Nevada Supreme Court clarified Nevada law on the appropriate test for determining whether discretionary act immunity applies.